## HENDERSON v. STATE.

No. A-11472. June 25, 1952.

(246 P. 2d 393.)

Garrett & Garrett and L. W. Wiley, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J. The plaintiff in error, Hosea Henderson, hereinafter referred to as defendant, was charged by information filed in the district court of Muskogee county with the crime of murder by the fatal shooting on October 10, 1949, of Nip Lockridge. The defendant was tried before a jury on the 28th and 29th of November, 1949. The jury did not agree and was discharged, but the case was reset and retried on December 28, 1949. The second jury by its verdict found the defendant guilty of manslaughter in the first degree, and fixed his punishment at four years in the penitentiary. Appeal has been duly perfected to this court, a petition in error together with case-made containing some 729 pages being filed herein on July 2, 1950, and having been prepared at the expense of the state, and brief filed on December 2, 1950, after extensions granted. Thereafter, the Attorney General sought to have the appeal dismissed by reason of the defendant having failed to include a copy of the judgment rendered by the court, citing the recent case of McMichael v. State, 93 Okla. Cr. 341, 228 P. 2d 203, and long line of cases listed therein; and on the ground that vital evidence of the only eyewitness to the shooting besides the defendant, consisting of some three pages, had been included in the copy of the case-made served on the county attorney, but omitted from the original filed in this court.

After response by counsel for defendant and oral argument before this court on June 20, 1951, an order was entered permitting appellant to file a supplemental case-made to contain the omitted judgment and the omitted evidence. The court reporter had carelessly omitted the evidence in question, and assumed the blame, and the attorneys had not discovered this error at the time of filing. The judgment had not been filed. The additional record was filed herein on June 25, 1951, and while the Attorney General had indicated that the record would be studied with view of confessing error and seeking retrial with object of obtaining a greater punishment of the defendant for the crime charged, if the record would justify such course, on December 4, 1951, he filed his brief.

We have carefully studied the evidence and briefs. Counsel for defendant have filed an exhaustive brief. Some twenty-six specifications of error are set forth, though but twelve specifications are argued, and two of such specifications are repetitious. We shall treat the specifications argued.

Counsel are always to be commended for vigorous effort in behalf of a client, but the record here is replete with technical objections. We recommend an examination of the comments of Judge Furman made in the early case of Ostendorf v. State, 8 Okla. Cr. 360, 128 P. 143; and of Judge Baker in Byars v. Territory, 1 Okla. Cr. 677, 699, 100 P. 261, 103 P. 532. That advice heeded would save attorneys effort wasted and the taxpayers much money.

From a study of the evidence of the eyewitness, particularly the evidence in the supplemental case-made, and the evidence as a whole, counsel won a signal victory before the jury, but another jury on a new trial, in view of the evidence, might assess the death penalty, or at least a long period of confinement. Under such circumstances it would appear that the defendant should have been happy with the verdict of the jury and fearful of the possible consequences of a new trial.

Defendant is a Negro farmer living near Boynton, and the deceased was a Negro garage owner, and school bus route franchise owner, who lived in Boynton. Both seem to have been considered substantial citizens in their communities.

While counsel's first specification of error is thought-provoking, the principles involved seem to have been fully treated by this court in previous decisions and contrary to the result now sought, and in the very cases cited by counsel. The first proposition raised is: "That the court erred to the prejudice of the plaintiff in error in overruling his demurrer to the information on the ground of former jeopardy."

Counsel argue that by reason of the fact that at the previous trial where Judge O. H. P. Brewer was presiding and at about 5:45 p. m. on the second day of the trial and after the case had been finally submitted to the jury, the judge, an aged person whom the record shows to have been in bad health and who only recently had been struck by a motor truck, announced that because of his condition, he did not like to leave home in the evening, and stated to the parties that Judge Summers, another judge of the district, had agreed to receive the verdict. Following this, the jury filed into the court room at about 10:30 p. m., and reported to Judge Summers that they were unable to agree upon a verdict, and Judge Summers, after questioning the jury, discharged them.

At the time the demurrer to the information herein was argued, Hon. E. G. Carroll, the trial judge at the second trial, stated to the attorneys, concerning the facts surrounding the appointment of Judge Summers by Judge Brewer to receive the verdict:

"It had been agreed in open court (however, I doubt that you did have that authority to bind your defendant) that Judge Summers could receive the verdict. You did that, but you didn't have that authority, but that was done."

On the same day the demurrer in question was passed on, the defendant filed and there was heard "Motion to Require the Court Clerk to Correct the Record to Show the Facts." It was sought to show just what happened in the first trial in connection with the designation of Judge Summers to receive the verdict of the jury and his subsequent discharge of the jury; and to have the clerk's minutes corrected accordingly. The following are pertinent facts developed:

"Court: I think it ought to show that somewhere around 5:45 on the afternoon of November 29th, at the suggestion of Judge Brewer of his feeling somewhat indisposed that he asked would it be agreeable for Judge E. A. Summers, District Judge in this, the Fifteenth Judicial District of Oklahoma—that he receive the verdict. It was agreed by the County Attorney and by the attorneys representing the defendant in this case. I understand you to say that was agreed. By Mr. Wiley: That's correct. By the Court: That there was no agreement by the defendant himself. By Mr. Wiley: That's right. By the Court: That the jury did send the judge word sometime later in the evening— By Mr. Wiley: A different judge. By the Court: That's what I mean, that they sent Judge E. A. Summers word sometime in the evening that they would like to confer with him; that they did so, and informed him that they were unable to reach a verdict. By Mr. Wiley: That they were sent back. By the Court: Sent, sent back, all right; and that the jury was brought into the courtroom and seated in the jury box, and whereupon the District Judge, E. A. Summers, questioned the jury as to the probability of their reaching an early verdict; and after questioning them at some length, the jury indicated that they did not think there was any probability of their ever reaching a unanimous verdict. Is that all agreed? By Mr. Edmondson: Yes, sir. By Mr. Wiley: Yes, sir. By the Court: And whereupon the Judge, in his own mind, decided that the jury would be unable to reach a verdict, and he, Judge E. A. Summers, discharged the jury. By Mr. Wiley: That's right. By Mr. Douglas Garrett: Without the jurors having reached a verdict. By Mr. Claude Garrett: Without the consent of the defendant or the defendant's counsel. By Mr. Edmondson: We're going to object to that last. By Mr. Claude Garrett: We'll take the testimony on that. By Mr. Edmondson: In the absence of objection; we'll go that far. By Mr. Douglas Garrett: I say without the consent, not over his consent, not over his objection. By Mr. Edmondson: Judge, don't make a record on that until you see what the picture is. By the Court: That the jury was duly discharged by Judge E. A. Summers, that there was no objection by either side to the jury being discharged. That they indicated they would not be able to reach a verdict, and whereupon the Court, E. A. Summers, discharged them without their reaching a verdict. Now, the records of the Clerk will be corrected to show the facts as I have dictated them."

In support of their contention that the trial court erred in overruling defendant's demurrer to the information, counsel divide their argument into two main divisions, and being, less numerous points urged thereunder:

"A. That insofar as this case is concerned, there was no competent court after 5:40 P.M. on the 29th day of November, A.D. 1949, and it matters not that another 'Judge' agreed to remain 'in town' and did receive the jury's report and discharge them. B. Whether or not there was a competent court after 5:40 P.M. on the 29th day of November, A.D. 1949, insofar as this case is concerned, it still remains that the trial jury was discharged without a verdict * * * 'upon its report of being unable to reach a verdict'; that it was discharged without the consent of the defendant, with undue haste, and by a judge whose first appearance in the case was to receive the jury's report; and that such discharge was unlawful and equivalent to an acquittal of the defendant, and constitutes a bar to a further prosecution for the same offense."

The settled law in this jurisdiction supports defendant's proposition under his division "A" above. The principal case cited from this jurisdiction is that of Allen v. State, 13 Okla. Cr. 533, 165 P. 745, L.R.A. 1917A 1085. In that case, which was a homicide case, the jury having retired to deliberate on their verdict, the judge was incapacitated from further proceeding with the trial on account of illness, and by agreement of the parties be designated an attorney of the court to receive the verdict of the jury. The jury found the defendant guilty of manslaughter in the first degree and fixed her punishment at eight years imprisonment in the penitentiary. The verdict was received by the attorney ap-

pointed to receive the same, and the jury was discharged without objection from the parties. This court held, among other things:

"That the reception of the verdict in a criminal case is a judicial act, which cannot be delegated, and a verdict so received is a nullity, and that no judgment of conviction could be lawfully pronounced upon such verdict."

And it was further stated in the body of the opinion:

"Every person charged with crime is entitled to a fair trial in conformity to the laws of the state, and it is a duty resting upon the courts to see that this guaranty conferred by the laws upon every citizen is upheld and sustained. In many cases this court has held that it is the duty of the presiding judge at criminal trials to be present during each and every stage of the proceedings before him, and when the record affirmatively discloses that he lost control of the proceedings by reason of his absence from the bench during the progress of the trial, a judgment of conviction will be reversed [citing cases]."

The above rule has been affirmed in the recent case of Ridenour v. State, 94 Okla. Cr. 92, 231 P. 2d 395.

One magistrate cannot delegate his authority to another magistrate any more than to a special judge that he might attempt to appoint to receive a verdict. The reasons are apparent, but are enumerated in the body of the opinion in the Allen case where numerous cases in support of this proposition are cited.

In the case of Tunnell v. State, 24 Okla. Cr. 176, 216 P. 951, cited by defendant, the defendant therein was charged with the unlawful manufacture of whiskey and was found guilty by the jury, and punishment fixed at thirty days imprisonment in the county jail, and a fine of $100. This court by reason of the judge having become incapacitated during the deliberations of the jury and having remained at his home, granted defendant a new trial. It was held:

"The reception of a verdict is a judicial act which cannot be delegated; and where, in a prosecution for a misdemeanor, the jury having retired to deliberate of [on] their verdict, the judge became incapacitated to further proceed with the trial on account of illness, and the following day by agreement of counsel a member of the bar received the verdict, held, that the verdict so received is a nullity, and no judgment of conviction could be lawfully pronounced upon it by the court."

This brings us to a consideration of defendant's contention under his division "B", that the discharge of the jury by the special judge was without defendant's consent, unlawful and equivalent to an acquittal and constitutes a bar to further prosecution for the same offense.

About the only difference in the material facts in the within case and that of Allen v. State, supra, is that in that case the jury found the defendant guilty and here the minutes show that the jury could not agree and after questioning by the special judge were discharged by him without objection on the part of counsel for defendant.

In the Allen case, in addition to the claim that all matters were a nullity after the court attempted to delegate his authority to a special judge, and then departed, it was contended that the defendant, having been placed in jeopardy, could not be tried on the charge a second time. This court in that case said:

"It is now insisted that the plaintiff in error was, by the proceedings of that trial, once in jeopardy, and cannot lawfully be put upon trial the second time. It is a well-settled principle of common and constitutional law that a person cannot be put in jeopardy a second time upon the same charge. Art. 2, § 21, Constitution of this state, declares:

" 'Nor shall any person, after having been once acquitted by a jury, be again put in jeopardy of life or liberty for that of which he has been acquitted. Nor shall any person be twice put in jeopardy of life and liberty for the same offense.'

"It is well established that after the jury has been impaneled and sworn in a criminal case any discharge thereof without sufficient cause operates as an acquittal, in that it effectually bars another trial for the same offense. But to have this operation and effect such discharge must have been made without the consent, expressed or implied, of the defendant. 1 Bish. New Crim. Law, § 998.

"In Cooley's Const. Lim. (7th Ed.) p. 467, the author says:

" 'A person is in legal jeopardy when he is put upon trial, before a·court of competent jurisdiction, upon indictment or information which is sufficient in form and substance to sustain a conviction, and a jury has been charged with his deliverance. And a jury is said to be thus charged when they have been impaneled and sworn. The defendant then becomes entitled to a verdict which shall constitute a bar to a new prosecution; and he cannot be deprived of this bar by a nolle prosequi entered by the prosecuting officer against his will, or by a discharge of the jury and continuance of the cause. If, however, the court had no jurisdiction of the cause, or if the indictment was so far defective that no valid judgment could be rendered upon it, or if by any overruling necessity the jury are discharged without a verdict, which might happen from the sickness or death of the judge holding the court, or of a juror, or the inability of the jury to agree upon a verdict after reasonable time for deliberation and effort, or if the term of the court as fixed by law comes to an end before the trial is finished, or the jury are discharged with the consent of the defendant expressed or implied, or if, after verdict against the accused, it has been set aside on his motion for a new trial, or on writ of error, or the judgment thereon been arrested— in any of these cases the accused may again be put upon trial upon the same facts before charged against him, and the proceedings had will constitute no protection.'

"The discharge of the jury under the circumstances of this case must be deemed to have been done upon the agreement and with the consent of the plaintiff in error. Again, the statute prescribes (section 5916 supra) [now Tit. 22 O.S. 1951 § 897] that in all cases where the jury are discharged, or prevented from giving a verdict by reason of an accident or other cause, after the cause is submitted to them, the cause may be again tried at the same or another term, as the court may direct. The record shows, and counsel for the plaintiff in error concede, that the sickness of the presiding judge was such that unfitted him for the further performance of his duties in the trial of the case.

"The word 'accident,' as used in this section, is variously defined as an event happening unexpectedly and without fault, or as an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a casualty or mishap. Under the foregoing principles and authorities, the discharge of the defendant on the claim of once in jeopardy should be denied in any aspect of the case contended for by her counsel."

The statutory provisions involved in the question being considered are Sections 895, 896 and 897 of Title 22 O.S. 1951.

Section 895 reads:

"If, after the retirement of the jury, one of them becomes so sick as to prevent the continuance of his duty, or any other accident or cause occur to prevent their being kept together for deliberation, the jury may be discharged."

Section 896 reads:

"Except as provided in the last section, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict, and rendered it in open court, unless by the consent of both parties entered upon the minutes, or unless at the expiration of such time as the court deems proper,

it satisfactorily appear that there is no reasonable probability that the jury can agree." Section 897 reads:

"In all cases where a jury are discharged or prevented from giving a verdict, by reason of an accident or other cause, except where the defendant is discharged from the indictment or information during the progress of the trial, or after the cause is submitted to them, the cause may be again tried at the same or another term, as the court may direct."

We conclude from the minutes and record, that Judge O. H. P. Brewer was in such poor physical condition on the evening of November 29, 1949, that he had to go to his home after submitting the case to the jury and could not safely return to the courthouse, and that by reason of the above statutory provisions and the holding in Allen v. State, supra, the discharge of the defendant on the claim of once in jeopardy is denied.

It is well to note that while it is also true, as set forth in Allen v. State, supra, that the parties by their agreement to have another judge complete the case cannot thereby confer jurisdiction on the new judge, we would reiterate that the case may be retried if the judge has to quit the trial due to illness. We would also point out that the effect of the further holding in that case that the parties could by their conduct be held to have agreed to the discharge of the jury so as to estop the defendant in a new trial from a plea of former jeopardy is not justified by the facts developed in that case. Though this is the settled law in this jurisdiction as set out in Coppage v. State, 62 Okla. Cr. 325, 71 P. 2d 509 (where one judge presided throughout the first trial and there was no question as to his losing control of the court and jurisdiction). In that case defendant was charged with the larceny of an automobile and at the first trial the jury deliberated during the afternoon of one day and from 5:40 p. m. until 9:15 p. m., and the jurors stating that they could not agree, the court declared a mistrial and the jury was discharged and the defendant did not interpose an objection. He was held to have waived his constitutional right. But it is our conclusion, as indicated, that such holding in the Allen case constitutes dicta, as such issue by reason of the facts was not properly before the court for consideration. For if the court in the first trial of this case was dissolved after 5:45 p. m. on November 29, 1949, and its actions thereafter were a nullity, as contended by counsel for defendant, and as supported by the cases from this jurisdiction heretofore cited, then how could anything that might happen thereafter entitle defendant to a discharge any more than it could subject him to a conviction? If the court was dissolved, it was dissolved for all purposes. The functions of the court cannot be suspended and the functions of the jury continue. What difference could it have made whether the jury considered the case four hours or forty hours? Or even, under such circumstances, whether defendant did or did not thereafter object to the discharge of the jury? Whether or not the defendant had suffered jeopardy and was entitled to a discharge would depend on the existence at the time the court lost control of the proceedings, of one of the grounds enumerated in the statutory provisions heretofore quoted. In contrast to the within case, a classic example of where the court without justifying facts summarily discharged a jury prior to verdict is in the case of Goodman v. State, 41 Okla. Cr. 405, 273 P. 900.

It is next claimed by defendant "That the court erred to the prejudice of the plaintiff in error in refusing to permit him to enter his plea of former jeopardy in the presence and hearing of the jury following the reading of the information to the jury by the county attorney."

The defendant first raised the above question by demurrer filed and argued on December 23, 1949, as set out above, and it was again raised orally by counsel.

for defendant following the reading of the information by the county attorney. The court heard argument out of the presence of the jury. The trial court from the undisputed material facts in connection with the discharge of the jury in the first trial, considered that there was no question of fact to be submitted for the consideration of the jury, and concluded that only a question of law was involved. The record supports the conclusion of the trial court. We have pointed out such evidence in the first specification of error herein considered.

See Collins v. State, 70 Okla. Cr. 340, 106 P. 2d 273, and Hazelwood v. State, 42 Okla. Cr. 38, 273 P. 1017. In the last case this court stated in the first paragraph of the syllabus:

"Where a plea of former jeopardy has been filed, and it does not involve a disputed question of fact, but merely presents a question of law, such plea should not be submitted to the jury, but the court should pass upon the question of law presented, and either sustain the plea and discharge the defendant, or overrule it and place the defendant on trial."

It is next stated, "That the court erred to the prejudice of plaintiff in error in overruling his motion to quash the panel of jurors summoned to appear before the court on December 28, 1949, and his challenge to the array."

This contention is based upon the passage by the 1949 Legislature of the Act appearing as Title 38, Session Laws 1949, 38 O.S. 1951 §§ 18-32, commonly known as the Jury Wheel Act. Sections 1 to 10, as amended, 11, as amended, and 12 to 17 of Tit. 38 O.S. 1941, were repealed by Section 16 of the Jury Wheel Act, 1949. So far as we can determine from the record, the jury panel from which the trial court in this case was selected had been drawn in accordance with the provisions of the old laws and definitely not in accordance with the Jury Wheel Act. It is further clear that the 1949 Act contained no delay clause and was enacted with the emergency clause, now presenting the question as to whether the Legislature intended that the existing laws should be superseded in so far as the same concerned the juries that might be needed for the remainder of the 1949 calendar year. And considering the Act as a whole, it is apparent that before the Act could be put in operation, it would be necessary that the jury wheels be purchased and installed. By express provision of the first section of the Act, Tit. 38 O. S. 1951 § 18, it is stated:

"Between the tenth and twenty-fifth day of November of each year, the County Treasurer or one of his deputies, together with the County Assessor or one of his deputies, together with the Sheriff or one of his deputies, and the County Clerk or one of his deputies, and the Court Clerk or one of his deputies shall meet at the Courthouse of their County in the office of the County Clerk and select from the list of qualified jurors, as prescribed by this chapter, of such county as shown by the tax lists in County Assessor's office for the current year, all qualified jurors for service in the District, Superior, Common Pleas and County Courts of such County for the ensuing year in the manner hereinafter provided."

The Attorney General in his brief points out:

"Thus the first step in the application of the new law could not possibly be taken until November, 1949. By the provisions of Section 3 [Tit. 38 O.S. 1951 § 20] the jurors to be needed in the ensuing term of Court are to be drawn from the jury wheel more than ten days prior to the beginning of such term. Thus the jury panel to be drawn from the jury wheel under this new Act could be drawn for the January term 1950. In the meantime there could not possibly be any jury drawn from the jury wheel, and to hold that the new Act operated to repeal and completely supersede the existing law during the remainder of the year 1949 could only have meant that there would have been no juries during the remainder of such year and that the constitutional right to a speedy

trial and trial by jury would be entirely destroyed during such period. It is always the intention of the courts in construing legislation to ascertain and effectuate the legislative intent. There can be no possible doubt as to such intent in the present instance, and to undertake to hold that the new Act must have been followed as to juries during the latter half of 1949, could do nothing except result in the most chaotic and intolerable situation."

In Houston v. State, 63 Okla. Cr. 49, 72 P. 2d 526, 628, this court said:

" '* * * To entitle a defendant to successfully challenge a panel of jurors, the burden is upon the defendant to show that the illegality or wrong which is the basis of such challenge is such as to have caused the defendant to suffer material prejudice.' "

The record fails to show that defendant met the burden interposed by the rule in the above case, which rule was approved in the recent case of Taylor v. State, 95 Okla. Cr. 98, 240 P. 2d 803, 809.

See Magnolia Pipe Line Co. v. State, 95 Okla. Cr. 193, 243 P. 2d 369, 372, wherein we said:

"To ascertain the intention of the Legislature in the enactment of statute, the court may look to each part of statute, to other statutes upon the same or relative subjects, to the evils and mischiefs to be remedied, **and to the natural or absurd consequences of any particular interpretation.**" (Emphasis now added.)

Applying the above principles, it is our conclusion that it was the intention of the Legislature that the law for selection of jury panels existing at the time of the enactment of the Jury Wheel Act, Tit. 38 O. S. 1951 §§ 18-32, would remain in full force and effect until the new law by its terms could come into operation, which we find was not until the January, 1950 court term.

It is next argued that the court erred to the prejudice of the defendant in overruling his various motions for continuance and not continuing the case until the next term of court.

After the discharge of the jury in the first trial the case was on December 6, 1949, reset for trial before a different judge for December 12, 1949; and on December 7, 1949, defendant filed a motion to set aside the order resetting the case for trial, counsel alleging that the order was made in the absence of counsel for defendant. After hearing, the court reset the case for December 28, 1949, and thereafter on the same day counsel filed a motion for continuance setting out that his client required further time to prepare for trial. That he lived over three miles from town, did not have a telephone or car and needed time to find witnesses to show that deceased was of a violent, turbulent and quarrelsome disposition; that he had threatened the life of affiant, and was known to go armed with a pistol, and while such facts were generally known, defendant required further time to get more names, etc. The court on December 7, 1949, overruled said motion. On December 23, 1949, another motion for continuance was filed, being similar to the first motion, but in addition setting out that December 28, 1949, would be in the heart of the Yuletide season, etc., "that the matter of postponing the cause until the next regular term of court is entirely within the sound discretion of the court." The court on the same day, after hearing a number of witnesses in support of the motion, including the defendant, who testified that he was having financial difficulties in obtaining sufficient funds for payment of expenses of witnesses, attorneys, etc., in preparation and trial of case, the court overruled the motion for further continuance.

From a study of the motions, affidavits and evidence in question, we cannot say that the court abused his discretion in failure to grant a further con-

tinuance. At the trial defendant produced various witnesses supporting his theory of the case—nineteen witnesses in all. There was no contention that there was but one eyewitness to the shooting other than the defendant, and defendant produced a number of witnesses who testified to the deceased being of a violent and turbulent temperament, though the state introduced witnesses who denied this. And further evidence, if it could ever have been obtained, would have apparently been in the nature of cumulative evidence. One hundred ten days elapsed from the date of the tragedy until the last trial. In the case of Mott v. State, 94 Okla. Cr. 145, 232 P. 2d 166, we said:

"An application for continuance on ground of want of time to prepare, for trial of criminal prosecution is addressed to sound discretion of trial court, and ruling of trial court will not be disturbed on appeal unless an abuse of discretion is shown."

See, also, Lemke v. State, 56 Okla. Cr. 1, 32 P. 2d 331; Littrell v. State, 21 Okla. Cr. 466, 208 P. 1048; and Briscoe v. State, 28 Okla. Cr. 306, 230 P. 520.

Counsel contends "That the court erred to the prejudice of the plaintiff in error in overruling his motion for the court to require a full panel of jurors to be present before proceeding to trial."

The record discloses that when the within case came on for trial the panel of 60 jurors had for various reasons been reduced to 28 jurors, and defendant objected to going to trial on this ground and the court announced that he would forthwith call 35 additional jurors. Counsel has not shown that any prejudice whatever resulted to the defendant. He was not deprived of any preemptory challenge, and twelve men were selected to act as jurors. We conclude that this allegation of error is not well taken.

Defendant's sixth specification of error is:

"That the court erred to the prejudice of plaintiff in error in overruling his objection to the introduction of any evidence on behalf of the State for the reason that the court had previously refused to allow plaintiff in error to enter his plea of former jeopardy.

The principles involved were answered in treatment of defendant's second proposition above.

We shall consider defendant's seventh and eighth specifications together, and being:

"That the court erred to the prejudice of [defendant] in overruling his demurrer to the sufficiency of the State's evidence after the State rested." And: "That the court erred to the prejudice of [defendant] in overruling his motion for an instructed verdict of not guilty made after the State had rested its case, and in overruling his motion for a directed verdict of not guilty made after [defendant] had rested his case, and in overruling his motion for a directed verdict of not guilty made after both sides had rested."

This calls for a summary of the evidence for the state and for the defendant.

Walter Bolton, investigator for the county attorney's office of Muskogee county, identified a plat of the inside of the store of Albert Haddad made by witness on November 29 and 30. He also took pictures of the inside of the store, and of the body of Nip Lockridge after it was exhumed, and on December 24, 1949. The plat and pictures were all later introduced in evidence.

Albert Haddad, who had been a resident of Boynton for about 33 years, and in the grocery business there about seventeen years, and who was then chairman of the town board and commonly referred to as the mayor, testified for the

state as to the facts of the difficulty in his store on the morning of October 10, 1949, between Nip Lockridge, who lost his life as a result of the trouble, and Hosea Henderson, the defendant.

Witness testified that both these parties were his customers, and defendant had a charge account at his store. His testimony developed that the immediate difficulty concerned a tire that had been lost off deceased's school bus, and found by defendant. Lockridge came into witness' store the morning of October 10, 1949, about 10:30, and had only been in about thirty seconds when Hosea Henderson arrived. After exchanging greetings with witness, Henderson said: "What are you going to do about that tire, Nip?" and Lockridge replied, "I am not going to do anything about the tire." Defendant answered, "I think you ought to give me a little something," and Nip told him that he was not going to pay for something that already belonged to him; told defendant that he should have taken the tire to an officer, justice of the peace, or someone, instead of trying to sell it. Defendant replied that he took the tire all over town trying to find out to whom it belonged. They were talking loud, and witness told them they should settle the matter. Nip left the store, saying that he was going to get his tire, and defendant said to witness: "That's just what I want him to do, is to get that tire."

Defendant left the store. Witness walked out in front. Defendant went across the street, but shortly returned to get some tobacco, and asked witness what he would have done, if it had been his tire. Witness told defendant that he would probably have given him something, and defendant said: "Nip aint doing me right, me and Nip is going to 'fist city' and if he whips me, I'll get up and shake his hand like a man." About this time Nip walked in the back door and announced: "Hosea, I went and got my tire." They started arguing again, and witness asked them to quiet down. They were walking around, and witness testified that he thought Hosea was going out of the store. He started to the back, pulled his coat back, pulled out a gun, walked over to the north aisle of the store and said, "Nip, damn you, you never did like me", and started shooting. Defendant was ten or twelve feet from Lockridge. Lockridge turned, went back down the aisle to the toilet and defendant was behind him. Witness went outside to call for help, "There is a shooting going on here, Hosea Henderson just shot Nip Lockridge." Witness went back into his store and defendant came up to him, handed him a $10 bill and told him, "Give me my money out of that." Witness said, "My God, Hosea, you've done an awful thing—give me that gun." Defendant told witness to change the money and said, "By God, he going to pay me. Give me $5, he going to pay me." Witness put the $10 in his cash register and gave defendant $5, and defendant went out of the store with the gun in his hand. There was no evidence as to where Henderson got the $10 from which he wanted $5 from Lockridge for finding his bus tire. Witness went outside again to look for help, testifying: "No one seemed to come in or wanted to come in," and he went back to Nip. Nip was lying on the floor, with one arm over the toilet seat. Witness asked, "How are you?" and Nip answered, "Oh, I'll make it, I'll make it." Witness told him to put one arm over his shoulder, and Nip did, and witness helped him to a bench some eight or ten feet away, and called the Bank for help. They called Nip's wife, and an ambulance. Witness testified that Nip was not armed, and denied that he himself was armed, and stated that he did not have a gun in his store.

Haddad identified pictures taken inside of his store and two pictures were introduced in evidence. Witness identified the drawing made by Walter Bolton, Muskogee County evidence man, and testified that he was present when the measurements, etc., were made, and identified different objects shown on the plat, which was introduced in evidence. This witness stated that Nip Lockridge

supported him in his race for town council in April, 1949. He admitted that he was listed as an honorary pall-bearer at Nip's funeral, but stated, "I didn't even go." Witness admitted that he held a "courtesy commission" from the sheriff's office in 1947, 1948 and 1949; and that Nip told him he also had one, but witness never did see Nip's commission.

Sam Riley and Marion Swadley saw Albert Haddad come out of his store on the morning of October 10, 1949, and wave and call for help. Riley had previously heard shots. Swadley saw Hosea Henderson, whom he knew and recognized, come out of the store and hurry up the street, and as he crossed the street saw a pistol in defendant's hip pocket; testified that it fell out, and defendant picked it up. Riley did not see the pistol.

Dr. M. L. Muckleroy of Muskogee examined Lockridge at the Provident Hospital, and described the gunshot wounds as one through the abdominal cavity which emerged on the opposite side; one in the left arm; and one between the shoulders in the back which did not come out of the body. He operated on defendant and found eight openings in the intestinal tract, and the abdomen filled with blood. He operated to close the openings. Witness testified that death was caused by the gunshot wound in the abdomen and loss of blood, and testified that deceased came in the hospital about midday October 10, and died October 11 between 11 and 12 p. m.

Dr. R. N. Holcombe testified that he examined the body of Nip Lockridge after it was exhumed December 24, 1949; described the gunshot wounds, affirming the descriptions of the other physician.

Kenneth Jefferson, 20 years of age, lived in Boynton and worked for Nip Lockridge. He testified that Nip went after a pair of gloves and returned to the shop, and left again about 11:25 saying he was going to get some meat for lunch. He learned about five minutes after Nip left the shop the second time that he had been shot. Witness started to the post office and Haddad told him to call Mr. Spencer, "The Law." Witness testified that Nip did not keep a gun in the shop; that he did not have a gun.

Floyd Spencer, night watchman hired by the town council, testified that he learned from Steve Williams (a bus driver for Lockridge) that Lockridge had lost a Chevrolet truck tire. He went to see Lockridge and got the number of the tire, and went to the second hand store, where he located it. The morning of the shooting Lockridge went to witness' house and awoke him, and witness gave Lockridge permission to go and get the tire. (Exception to this answer was sustained.) After Lockridge had been to his house, a colored boy came after witness, and he went to Haddad's store. Seven or eight people were in the store. He found Nip Lockridge on a bench, as testified by Haddad, learned that he had been shot and who shot him, and went to look for Henderson. He saw no gun on or about Lockridge or Haddad, or in the store. On cross-examination he admitted that he did not search anybody for a gun.

Ollie Penny testified that he had been a teacher in the Boynton schools for ten years, and had known defendant and Lockridge all his life; that Hosea Henderson came to his door the morning of the difficulty and told him: "I shot Nip Lockridge, and I'd like for you to carry me out to my children's house and let them know what I have done." Defendant had his gun at that time. Witness took him out to his home, six miles from town, and they went from there to the courthouse in Muskogee. They had no conversation about the shooting. Defendant gave him $5 and asked him to give it to Clifford Main, with whom he had left the tire. Defendant left his gun, which was loaded, in the car of witness when they went to the sheriff's office, and witness took the gun to

defendant's home on his way back from Muskogee. The gun was admitted in evidence, without objection.

Dave Williams testified that he was eighteen years of age, had lived in Boynton all his life, and drove a school bus for Nip Lockridge. He lost a spare tire off his bus in September near Henderson's home. Counsel for defendant admitted that the tire was in court, and was found by defendant and taken from the secondhand dealer.

Steve Williams also testified that he drove a bus for Lockridge, that he saw the tire in controversy at Cliff Main's Shop (where shown to have left by Henderson) and that he told Lockridge it was there. He helped put the tire on the bus. He had known Henderson all his life, and denied telling the two daughters of defendant (who were his second cousins) that Lockridge was armed, and carried a gun in his car or truck all the time.

Viola Lockridge, wife of Nip Lockridge, testified that they had been married twenty-seven years, and her husband had been in business in Boynton about thirty years. That she had known defendant since she was a young girl; that defendant came to their house on Sunday (before the shooting on Monday). That Gene Smith, Sallie Lewis, and the father and mother of Albert Haddad were present at her home at the time. Defendant and her husband talked, but she did not hear the conversation. Mrs. Haddad went in the house, but Mr. Haddad did not. Only Gene Smith and her husband were on the porch when defendant was there.

This completed the evidence of the state.

Clifford Main, proprietor of the second-hand store in Boynton, testified for defendant, stating that he first met defendant when he came in to sell a tire October 7, 1949. Witness identified the tire, testified that defendant brought it in for sale and wanted $5 for it. Witness inquired about where he got it, and was told by defendant that he found it. Defendant told witness that he had had the tire three weeks, had advertised it three weeks and had it at two different filling stations. Witness offered $3 for the tire, with the understanding that if the owner showed up, defendant would give him $5. Lockridge came and got the tire on October 10, and later defendant's boy paid witness the $5. On cross-examination witness testified that on one day he went to deliver some watermelons and when he returned his wife told him Floyd Spencer (the nightwatchman) had been there and said for him not to sell the tire.

This witness was asked, on cross-examination, if he had had anything to drink, and he answered, "since midnight." The county attorney asked him if he had been drinking steadily since midnight, and he answered: "I don't know." He testified that he saw the defendant in front of his place after the shooting, and defendant said, "I shot Nip Lockridge and I ought to have got them both" and that he wanted someone to take him home to talk to his children. He testified that he didn't know who defendant was talking to, but he took his gun out of his pocket and waved it around and said, "I ought to have shot them both." Witness then went into his store and got a new 12-gauge pump gun and put five shells in it and came out the door, and defendant ran around the corner, with his gun still in his hand.

Edgar Fleming, had known both defendant and deceased more than 30 years. He was about a block north of Haddad's store the day of the difficulty and saw defendant running, and asked him the trouble, and defendant told him he and Nip had some trouble. Witness went to Lockridge's garage and found no one there, but learned from a boy that the trouble was at Albert Haddad's store.

He went in and asked Lockridge if there was anything he could do, and he answered "no." It was only three or four minutes from the time defendant told him he and Nip had some trouble until he got into Haddad's store. He saw Van Crooch at the Bank, but Crooch did not go with him to the store, and did not come while witness was there. When witness got to Haddad's store Ed Johnson, Mr. Kelly, Albert Haddad and Nip Lockridge were there. Lockridge was on a bench at the rear. Witness stayed until the ambulance arrived, about twenty minutes.

Hosea Henderson testified in his own defense, stating that he lived on a 160-acre farm three miles east and a mile and a quarter north of Boynton, which farm he had purchased from one A. C. Trumbo, from whom he had formerly rented at another location for twelve years. He had three children of school age at home, being from 12 to 19 years of age, and one grandchild three years of age, and the mother 33 years of age. His wife was deceased. Defendant testified that in 1946 he could not get the school board to direct Nip Lockridge, the deceased, who had the school bus contract, to drive by his place for his children; that two of the board members directed him to see Nip, which he did, and that Lockridge told him that he "could not pick up my children, lessen I got right with him." That is, witness concluded, that Lockridge wanted him to vote as he might direct, and he refused and told Lockridge, "I votes my own sentiments." Witness stated that he then went to Oklahoma City and called on the State Superintendent of Schools about the matter; that Lockridge had also said that his children could not go to school at Boynton, but would have to go to Taft. That the State Superintendent told him that he was entitled to send the children to the separate school at Boynton, and the school superintendent at Boynton was supposed to furnish the funds and he was directed to return and see Mr. Morgan, the superintendent, which he did, and Morgan sent him to see Nip, and Nip said that Morgan told him to offer defendant $50 and get witness to furnish his own transportation, and later he got a letter to that effect. He was not able to get his children picked up in 1946, but in 1947 they agreed to come within a mile and a half of his house. Witness tried to get Lockridge to come closer to his house but he would not, and he stated that Lockridge was mad with him. He said: "He called me into his shop and showed me his deputy sheriff's commission, and he say, 'I can arrest you, boy, if I want, but,' he says, 'me and you is all right'. He says 'Yeah,' he says, 'Well, boy, I have got the other here,' and he showed me his pistol." Witness further claimed that at the last presidential election before the trial, Lockridge had told him that he could not vote in Boynton. The election was being held at the City Hall. But witness stated they finally permitted him to vote. Witness also testified to learning about Lockridge having trouble with a number of other persons, and that he was considered the "king pin" or leader among the colored people, and figured they ought to vote his way. That one time Lockridge offered to beat him up if he did not vote his way.

Defendant further testified, admitting that he had found the bus tire and wheel that had been offered in evidence by the State, stating that he found it in the section line near his home; that he kept the tire and wheel at his home for two or three days and then took it to Boynton, and left it at Anspaugh's Filling Station, hoping to sell it to one Roosevelt Allen for $10, but went back and got it in five or six days, and took it to Polk and Sellers' Garage. Mr. Sellers told witness that he could not use the tire, and knew of no one who had a truck it would fit, unless it might fit Nip Lockridge's old busses, and Sellers offered him $3 for the casing, which he refused to accept. He then took the tire to Clifford Main, and told him that he wanted a $5 reward for finding the tire, and would leave it with him if he would give witness $3, and if anyone came for it, Main was to collect $5. Mr. Main finally agreed to do this, and gave witness

$3. Later Main told him he had learned that the tire belonged to Nip Lockridge, and the following Sunday witness went to the home of Lockridge to see about collecting a reward. He testified that Lockridge told him he had been lying low about the casing, "and so the man that come up with it, I'm going to whip him and kill him." Witness told Lockridge he had found the casing, and he left Lockridge's place. Others who had been on the porch where he was talking to Lockridge had left, with the exception of Mr. Haddad, father of the grocer.

Witness stated that on the following Monday morning he saddled his horse and rode to Boynton to get some chewing tobacco, and put his pistol on by reason of his conversation with Lockridge. He tied his horse behind the Williams Drug Store and went across the street to Albert Haddad's grocery store, and "I saw Mr. Haddad sitting in the back at the desk and talking to Nip Lockridge who was standing up." Witness exchanged greetings with both men and told Haddad he wanted three pieces of tobacco, and Haddad told him he was busy talking, and for him to wait a while. Witness stated that he, witness, then asked Lockridge if he had been to Main's about the casing, and asked Lockridge to pay him $5 as a reward for finding the casing, and Lockridge said, "I'll be God-damned, how in hell you going to put a price on something of mine?" Witness further testified to being "cussed out" by Lockridge, who thereafter left the store, and as he left Haddad asked him to pay the $5 reward, and Lockridge said, "Hell no; the God-damned thing belongs to me." Witness testified that Haddad then tried to talk to him, but witness refused to listen and left the store, going back across the street to the Williams Drug Store, and there he talked to some other man and had forgotten about his tobacco, and returned to Haddad's store to get it and asked Haddad for the tobacco and Haddad gave it to him and the change, and about that time Nip Lockridge came in the back door. Witness stated:

"He come in in a hurry, and when he got right there where them scales is, he says, 'Hosea, I got my tire.' Te says, 'You God damn son-of-a-bitch, I'm going to whip you or kill you.' He comes this way (indicating) and I comes in here (indicating). He gets to this corner (indicating), and I done made it just like that (indicating). I ducked back around, a-coming down the aisle (indicating). That's when the shooting commenced; so Albert Haddad was standing right here (indicating). He made a grab at his pistol, and I shot at Mr. Lockridge three times, and I shot at Albert one shot to make him miss me with his pistol. I didn't want to kill him. I didn't want to kill Mr. Lockridge, either, but Albert broke and run and dropped his pistol by the meat case. Q. Go ahead. A. Nip Lockridge—he walked around and walks back there, and him and Albert walks back down to the door like that (indicating). I squats down there behind this thing, behind this meat case and re-loaded my pistol. So I heard them coming walking back—both of them walking side by side. I steps back and out like that (indicating); my pistol in my hand. This Albert—Albert comes up, and he says, 'Hosea, here's ten dollars.' I say, 'Albert, you don't owe me no ten dollars.' I was backing up like that (indicating). I says, 'Mr. Lockridge owes me five dollars.' Albert got along there (indicating). He say, 'Wait, I'll get change.' Albert got in there and got change and walked on out and handed me five dollars. I just kept backing and backing out the store. Albert turned around and met Nip, and him and Nip turns and walks right back in the back. I was just backing out, backing, coming on out—backing up. Lockhart [Lockridge] comes back and Nip sits down on the bench. Albert stops down by Nip, and I was backing down this aisle (indicating). When I got outside the store, I squatted down to keep them from shooting me, and I broke and run right down the side of the bank. That's just the way it was. I left them two sitting right here (indicating)."

On cross-examination defendant stated that Lockridge tried to draw his pistol and it hung and he took both hands to get it dislodged; that witness did not want to kill him and tried to shoot deceased in the right arm. Witness

stated that he was shooting toward the front of the store, and stated that after the shooting he got Ollie Penny to drive him to Muskogee to give up.

A. V. Trumbo of Muskogee, 83 years of age, testified that he had known defendant fourteen years. He testified that defendant rented a farm from him, and later witness sold defendant the place where he was living at the time. He testified that defendant was "Just as fine as any negro I ever knew" and an objection was properly sustained to this remark. On cross-examination witness stated that he had not talked with anyone in or around Boynton about defendant's reputation because he knew him so well himself.

In an effort to impeach state's witness Haddad, the defense produced two witnesses to show that Haddad had welched on a gambling debt, and that he kept a pistol at his store.

Ted Sessions, of Okmulgee, formerly in the farm implement business and now in the oil lease business, testified that he knew Albert Haddad well, visited in his home, went to dances with him, and played poker with him and had known him ten years. He testified that "just after the big freeze this year, 1949" witness and Andy Hancock went to Haddad's store. A few days prior to this Haddad had been in a poker game with witness, Hancock and others in a hotel in Okmulgee, and Haddad had lost and witness won $300 on the last card. Haddad gave Hancock a check for $720 to cover his losses and left, saying that it was a crooked game. The check was returned, marked "Insufficient funds" and witness went with Hancock to see Haddad about payment, as witness had stood good for the check. Haddad reached under the cash register and got a gun, placed it on the counter and said, "There's not much you boys can do. You could take that gun and shoot me." Witness told him he didn't figure he was worth shooting, and told him to put the gun back, which he did. Haddad paid Hancock $200, and Hancock returned his check. Witness felt hard at Haddad on account of the check, and he stood one-half of the difference, giving Hancock his check for $260. The attorneys for the defendant had represented this witness. It seems that the county attorney had gone over to Okmulgee the night before the trial and talked to witness at a square dance, and the county attorney made some notes. At the time he told the county attorney: "When Albert says he never owned a gun, that I believe that." And that he used to run around with Albert, and never saw him with a gun. This witness testified that Andy Hancock "is a bookie, he don't deny it;" that he had introduced Haddad to Andy and "he was my guest" and he would have paid the $520, difference between the check and amount collected, but Andy offered to stand half the loss.

Andy Hancock stated that he worked in a pool hall in Okmulgee, had never had any business dealings with Haddad but played poker with him three times, and first got acquainted with him two years ago. Three others were in the game with Ted Sessions, Haddad and witness. When the game was over, Albert gave witness a check for $720, which was returned by the Bank with the notation "Payment stopped." The poker game was during the time the snow and ice were on the ground, and the check came back ten days later. Ted Sessions stood good for the check, Haddad gave witness $200 and witness returned his check. Haddad stated that he did not have the money to take up the check, that he got a pistol from a little box by the side of the cash register and just laid it out there and said: "There's a gun. You can shoot me if you want to, but I can't pay you—haven't got that much money." Haddad told witness that he would give him $200 if he would return his check, and would pay the balance as soon as he could. On cross-examination witness stated that he worked at Bob's Billiards, also known as Clyde's Bar, that he took bets there, and when asked: "Your profession, then, is that of a bookmaker, or bookie?" he answered,

"Well, I don't know if you call me that or not, I take bets." He testified that the check was marked "Insufficient funds" and "Payment stopped" and that Ted Sessions paid half the loss. Haddad later paid him $20 more. He was asked: "And didn't you also tell me that Ted Sessions went over to Boynton and did a lot of talking to try to defeat Haddad for mayor? A. I believe so."

Ted Sessions had denied that he took any part in the election. He was asked:

"You went over and campaigned against him [Haddad] when he was running for town council in Boynton, didn't you? A. I absolutely did not. Q. You want to swear that you did no campaigning against him of any sort? A. I never approached nobody in Boynton, Oklahoma."

Clark Epperson testified that he had lived in Boynton since 1902 and had known Albert Haddad since he was three years old. That Albert kept a pistol— "he kept it under the cash register," on a shelf under the cash register. He had known Nip Lockridge more than 25 years, and did not know his reputation for being a violent, turbulent troublesome man. He had been chairman of the town board, and on cross-examination admitted that Haddad defeated him for councilman in the last election. Since the first trial, in November, witness had paid a fine in Boynton for being drunk and interfering with an officer. When again asked about the gun in Haddad's store, witness testified: "I have seen it there many times." Witness denied he ever had any trouble with the deceased.

Wiley Woodward, James L. Guthrie and Ed Morris testified that they were acquainted with defendant's reputation in the community in which he lived, and that it was good.

Earl Bell, former school board member, had lived in Boynton twenty-five years, and was once in business there. He testified to difficulties defendant had getting a school bus to pick up his children. Defendant lived a mile and a half off the route as fixed at that time. Witness went to a member of the then board in an effort to help defendant, stating that the policy when he was on the board was to pick up children anywhere, but the policy had changed; the present board had a contract with Nip Lockridge for a fixed route, Lockridge to furnish busses, gasoline, upkeep, etc., for a contract price. He was not able to help defendant.

Owen H. Penny, a medical doctor, testified that he had known defendant thirty-five years, delivered practically all of his eight children and that defendant's reputation was good. He was on defendant's bond, and the father of the man who took defendant to Muskogee to give himself up after the difficulty.

J. J. Frazier, a farmer in the community for 30 years, knew both the deceased and defendant some 20 or 30 years. He testified that Lockridge was quarrelsome, very quarrelsome at times. He had trouble with the deceased at one time over a lease. Lockridge rented a place witness was occupying, but on crossexamination he denied that he was mad or cross about the matter.

Josephus Durham testified that about the last Saturday night in July, witness passed deceased's place and saw he had some cattle out on the highway, and on Sunday he told Lockridge that someone was liable to run over the cattle and kill some of them, and Lockridge said he didn't think so, "and he said, 'I'll take care of them' and showed me his authority—a pistol. And I said, some law liable to come by here and take that off of you,' " and Nip reached for his billfold and showed witness "his commission", a deputy sheriff's commission.

Ned McGown testified that he had known defendant and deceased 26 years, and that deceased's reputation was bad. On cross-examination he admitted that he was a good friend of Dr. Penny, and that he had signed defendant's bond.

Jess Jackson testified that he had lived in the Boynton community since 1900, had known Lockridge since 1910, and that his reputation with witness was bad. Witness had trouble with Lockridge in his garage five years prior to the trial. They were discussing politics and witness did not know that Lockridge was mad until he hit witness, accusing witness of "raising hell around here." They clinched and Paul Brown separated them, and no other licks passed. Witness also had trouble with Lockridge at a time when deceased was trying to raise money to buy a lot for a school house and witness objected. At that time Lockridge had said that he would pay for the lot himself. Witness testified that he came to Oklahoma City to try to get a school for colored children in the Boynton area; that they had a meeting about the school budget, witness presiding, and he testified, "I had to set Nip down, he raised so much ned."

Paul Hallfast, undersheriff of Okmulgee county, testified that while Eddie Briggs was sheriff a deputy sheriff's commission, No. 677, was issued to Albert Haddad in 1947, and No. 947 was issued to N. L. Lockridge in December, 1947. That the commissions had never been turned in and were still outstanding, and that the newly elected sheriff had issued a new commission to Haddad, but Lockridge was dead when he assumed office.

Will Farmer had known defendant eight or nine years, had some farm dealings with him. There had been some questions about defendant and this witness and his son having trouble over some hay, but this witness denied. He explained that he traded defendant some oats, and was to take hay; witness was in Colorado when the hay was cut, it got wet, and witness' boys thought he would not want the hay. When witness returned, defendant told him about it and said he would just pay for the hay, which was done.

Imogene Henderson, daughter of defendant, was offered as a witness, but objection made by the state for the reason that she had been sitting in the courtroom all during the trial was sustained.

Imogene Henderson, daughter of defendant, was offered as a witness, but objection made by the state for the reason that she had been sitting in the courtroom all during the trial was sustained.

This completed the evidence of the defense.

The state offered the evidence of some fifteen rebuttal witnesses.

J. H. Smith testified that he was at Lockridge's home on Sunday afternoon, October 9, when defendant came and told deceased that he heard he had lost a tire. Lockridge replied that one of the boys had lost one off a school bus, and if defendant had found his tire he would know it, because the tires were numbered; and Lockridge told defendant, "If it's my tire, why me and you can get together on it." There was no trouble, "no ugly words spoke."

Albert Haddad recalled, testified that there were no shelves under the counter on which his cash register stood, and he had never kept a gun on any sort of a shelf in or around his store. He testified that Ted Sessions and Andy Hancock came to his store to see him about the check he had given in the poker game, and on which he had stopped payment. He stated that both men were very angry, witness told them their game was crooked and he didn't intend to pay the check. His wife was present and they threatened to sue him. He stated that he never at any time placed a gun on the table, that he did not have a gun in the store that day.

Mrs. Albert Haddad testified that she had been married 17 years, that her husband did not own a gun and did not have one when Ted Sessions and Andy Hancock were in the store.

G. G. Morgan, a member of the department of rural education, testified that defendant came to his office in the spring of 1947 to see about his children being picked up by the school bus. Witness denied telling defendant to see Nip Lockridge about it. On cross-examination he stated that the bus went within a mile and a quarter of defendant's home in 1947, that Nip Lockridge's reputation was good, that he had considerable influence in election time and took an interest in politics.

Frank Wollfinger had owned an elevator in Boynton since 1931 and was a member of the school board. Defendant had complained to him about the school bus service, stating his children had to walk a mile to the bus. Witness did not tell him to see Lockridge; and that Lockridge's reputation was good.

Archie Sutton had lived in Boynton all his life. He was 36 years old, and president of the board of education. Defendant complained about the school bus service first in 1947. He told defendant to go and see Lockridge, that the contract had been let and the route fixed. Mr. Morgan promised to pay Lockridge if he could get the money, and Lockridge did pick up defendant's children, not knowing whether he would get his money or not. Lockridge supplied the busses, paid all the expenses, including insurance, and got $3,800 a year. Witness did not tell defendant he would have to see Lockridge. He had known Lockridge 25 years, and his reputation was good. On cross-examination he admitted that Lockridge helped get him elected. Lockridge had a son teaching in the Boynton schools at $200 a month, and his salary was raised to $250—all teachers were raised. Lockridge was paid $466 a month for the busses "last year, and $500 this year."

Rev. Bert M. Jones testified that he got to the store just as they were taking Lockridge out. There were present Albert Haddad, the ambulance driver, Lockridge's wife and another relative. He saw no gun on the floor or on Haddad or Lockridge. He looked all over the store for bullets. He testified that Lockridge was "An influential man of the town" and that his reputation was good.

Van C. Crooch, cashier of the Bank in Boynton, testified that Haddad called him immediately after the shooting. Only Lockridge and Haddad were in the store when he entered. He saw no gun about Lockridge or Haddad, and did not see one on the floor. He had known Lockridge more than thirty years, and his reputation was good. He had known Haddad some twenty-five years, and never saw a gun in the store. He testified that defendant's reputation was good, and both he and the deceased were customers of the Bank.

C. E. Gray, superintendent of schools at Boynton, Mrs. Carl Burrows, city clerk, and Quincy White, Herman Kellums and H. A. Brice all testified to the good reputation of the deceased.

Harvey Lockhart had known the defendant eight years and testified that his reputation was bad, but later qualified his answer by saying, "I am speaking of my own opinion." The court on objection of defense counsel struck this answer from the consideration of the jury.

R. T. Sypert, sheriff of Muskogee county, explained the difference between deputy sheriff commissions and courtesy cards. The only difference in the cards was that the courtesy cards contained the words, "Without Compensation."

*This completed the evidence.*

From a consideration of the evidence set out and summarized, it is at once apparent that if the jury believed the eyewitness Haddad, they would have been justified in finding the defendant guilty of murder. The evidence indicated that defendant had blamed deceased with his inability to get the school bus to deviate from a fixed route and pick up his children for school during 1946; that he thought deceased was trying to be the political boss among the Negroes and control voting, and he resented this; that he claimed defendant tried to prevent him from voting in Boynton in a presidential election, and claimed that deceased had abused and threatened him; that he thought deceased was being unfair to him in not wanting to pay a reward for a school bus tire defendant had found in the highway and that belonged to deceased. But regardless of whether defendant was or was not justified in his grievances, the fact remains that he armed himself, proceeded to Boynton and admittedly brought up his grievance about the tire as soon as he saw Nip Lockridge in Haddad's store. Mrs. Haddad was in the store the first time the parties quarreled the morning of October 10, 1949, and her testimony refutes the statement by defendant that deceased used profanity, threatened him and abused him. And even if defendant had reason to be offended at Lockridge and deceased had been guilty of the abuses claimed, such, standing alone, would not have justified defendant in drawing his pistol and shooting Lockridge, if Lockridge was unarmed and made no overt act to injure defendant, as testified to by Haddad.

On the other hand, if Nip Lockridge attempted to draw his pistol and shoot the defendant, the defendant under the circumstances as testified to by him, would have been justified in shooting Lockridge, and in shooting at witness Haddad.

It is significant that no pistol was seen either on Lockridge or Haddad or on the floor and that neither of two armed persons were able to draw their respective weapon. Three witnesses did testify that Haddad was in the habit of keeping a pistol in his store, one of the witnesses being a political enemy and the other two being persons who had trouble with him over a gambling debt where Haddad claimed they attempted to cheat him. Other witnesses testified that Haddad did not keep a pistol at his store. All these matters and other matters enumerated were for the jury to consider. The evidence was conflicting. There was evidence to support the verdict of the jury.

In the case of Woods v. State, 92 Okla. Cr. 53, 220 P. 2d 463, 464, we said:

"2. Where the evidence is conflicting and different inferences may be drawn therefrom, it is the province of the jury to weigh evidence and determine the facts.

"3. The function of the Criminal Court of Appeals is limited to ascertaining whether there is a basis, in evidence, on which jury can reasonably conclude that accused is guilty as charged."

See, also Martin v. State, 92 Okla. Cr. 182, 222 P. 2d 534.

Defendant's assignment of error nine is: "That the court erred to the prejudice of [defendant] in refusing to permit defense witness Imogene Henderson to testify."

The witness in question was a daughter of the defendant, and the rule had been invoked and the court had instructed all witnesses to remain outside the courtroom until called to testify, but Imogene Henderson remained in the courtroom. In the recent case of Woolridge v. State, 93 Okla. Cr. 245, 225 P. 2d 1028, in the second paragraph of the syllabus, this court said:

"Where the court orders witnesses to be sworn and excluded from the courtroom during the taking of testimony, and a witness wilfully violates such rule, it is within the discretion of the court to allow or exclude the testimony of such witness."

We shall consider together defendant's assignments of error ten and twelve, having to do with alleged misconduct of the county attorney in making side remarks and in making alleged inflammatory remarks in closing argument to the jury.

The record shows that when the court would sustain an objection interposed by defense counsel throughout the trial, they would almost invariably say to the court: "Thank you." After defendant's witness Farmer had testified, Mr. Wiley for the defense said: "Thank you, Mr. Farmer, very much. You—" The county attorney said: "You ought to thank him." Then general bickering set in. Some of the attorneys for the State would also at times thank the judge. Such remarks are unnecessary, appear out of place, and are not to be approved. Here such unnecessary remarks by defense counsel evoked an unnecessary remark from the county attorney, equally not to be approved.

The defense tried to impeach State's eyewitness Haddad by having two of his poker playing companions testify about him turning down a gambling check and having a pistol in his store, all as heretofore recited, and special prosecutor Robertson argued:

"He was a witness to a horrible incident that happened in his store. And, like any other good citizen would do, he came into court to tell what he knew about it, and I tell you, gentlemen, I sympathize with him. He was harassed; he was embarassed; his private life was split wide open. He was subjected to every kind of humiliation while he was on the witness stand, and why? Just because he came into court as a good citizen should do to tell what he knew about that murder out there in his store in Boynton."

The evidence of Haddad inadvertently omitted by the court reporter in the original casemade filed in this court but contained in the supplemental, would certainly have supported a verdict of murder, if believed by the jury, so that there was basis in the evidence to support the statement by Mr. Robertson.

We note that counsel for defendant continuously interrupted counsel for defendant continuously interrupted counsel for the State as they argued the State's case, and there was much bickering back and forth. The argument of defense counsel is not shown in the record, but some of the alleged improper statements made by the prosecution in argument were apparently made in answer to remarks and argument made by defense counsel.

The above is a fair sample of innumerable matters complained of as to the arguments of counsel for the State. No useful purpose would be served in pursuing this further, particularly where this opinion is already too long. In many instances the county attorney showed commendable restraint, and the court throughout the trial demonstrated the patience of Job in trying situations. See paragraphs 6 and 7 of syllabus in the recent case of Hamilton v. State, 95 Okla. Cr. 262, 244 P. 2d 328.

It is evident that the jury were not influenced prejudicially against the defendant by the matters complained of.

By their fourteenth assignment of error, counsel for defendant attack the judgment and sentence as insufficient, based on incompetent minutes and the judgment rendered not being included in the original casemade. Of course it is the duty of an appellant to this court to see that the record filed here is com-

plete, and after motion to dismiss was filed herein by the Attorney General, the record was completed at instance of counsel for defendant, and the matters complained of in brief were supplied after defendant's brief was filed herein.

It is finally argued, assignment of error 22, "That juror R. M. McGowan was at the time of his service as a juror in this case a deputy sheriff of Muskogee County— was not a mere 'courtesy card' holder, and that he took the regular oath as a deputy sheriff."

It is further set out that neither the defendant nor any of his counsel learned that the juror was a deputy sheriff until after the verdict of guilty was returned; that the court read to the jurors and inquired of them whether any of them were so disqualified and that juror McGowan failed to make known to the court that he was a deputy sheriff.

This matter was set up in defendant's motion for new trial, and evidence was heard in support thereof.

Paul Hallfast testified that he was the undersheriff of Muskogee county, and was such on the 28 to 31 days of December, 1949. He stated that he did not know R. M. McGowan, a juror who served in the Hosea Henderson case, personally. He stated that his records showed that a deputy sheriff's commission, No. 140, was issued to R. M. McGowan by direction of Sheriff R. T. Sypert, and that he prepared it, and the sheriff signed it. He stated that he probably handed this card to McGowan in that witness notarized the signature on the back of the card. Witness did not have the card, but had card No. 464, which he stated was identical, except as to number.

On cross-examination witness stated that he would not know R. M. McGowan if he should see him, and he was not positive that he administered the oath to him. He stated that McGowan had never received any salary or mileage as deputy sheriff, or performed any official act; that the kind of card issued to him was commonly referred to as a "Courtesy Card."

Sheriff Sypert testified that his office had issued a deputy sheriff card to R. M. McGowan. On cross-examination he stated that R. M. McGowan had never acted in any official capacity. This statement was stricken, whereupon the county attorney stated, "That is all." And requested the court to strike out the testimony of both undersheriff Hallfast and Sheriff Sypert, for the reason that the commission itself issued to R. M. McGowan was the best evidence. The court overruled this objection.

As shown, the undersheriff was not positive that juror McGowan ever appeared before him to take an oath as deputy sheriff. And no wonder, as the record discloses at least over nine hundred courtesy cards had been issued by the sheriff in Muskogee county. The card issued to Mr. McGowan was the best evidence as to whether he ever subscribed his name to it, and accepted it and as to whether his signature had actually been acknowledged. It could be the courtesy cards were just mailed out to persons outside the city of Muskogee. R. W. McGowan was not offered as a witness. The burden was on petitioner for new trial. He failed to meet that burden.

That persons holding reserve deputy sheriff's commissions, or so-called "honorary commissions", or "courtesy cards," are disqualified to sit as jurors has long been settled in this jurisdiction, and even though the commissions issued while required to be approved by the Board of County Commissioners have not been complied with. Tit. 19 O. S. 1951 § 547. See Tripp v. State, 63 Okla. Cr. 41, 47, 72 P. 2d 529, citing Robinson v. Territory of Oklahoma, 10

Cir., 148 F. 830. In that case we pointed out the vice of the practice of issuing such cards and condemned the practice.

In the Tripp case the fact that two jurors held such reserve commissions was discovered by the questioning of counsel for the defense on voir dire examination, but the trial court thought such did not disqualify the jurors in question, whereas in the within case although the voir dire examination is not shown in the casemade, it is apparent that counsel for the defense did not question the jurors concerning whether or not any of them were holders of honorary deputy sheriff's commissions, or courtesy cards, as such is not alleged in the motion for new trial. It would appear that the facts in the later case of Allen v. State, 70 Okla. Cr. 143, 105 P. 2d 450 and the facts in the within case involving the question now considered, are quite similar, and the holding in such case is decisive here. There Jones, J., for the court set out the rules of law as follows:

"Defendant in criminal prosecution has duty to ascertain, by proper examination on voir dire, the competency of jurors, and, if he fails to do so, he waives his challenge, notwithstanding that disqualification is unknown to him until after rendition of verdict.

"Granting a new trial in criminal prosecution for disqualification of juror, which was unknown to defendant until after rendition of verdict, is matter of judicial discretion.

"In a prosecution for murder, the defendant was not entitled to a new trial where a juror is issued an honorary special deputy sheriff's commission and served on the jury without revealing that fact and the fact was not discovered by defendant or his attorney until after the verdict, since neither the sheriff nor his deputies were witnesses in the trial of said case, and the facts show that the jury would have been justified in returning a verdict assessing a much greater punishment."

Also, in the case of Stouse v. State, 6 Okla. Cr. 415, 119 P. 271, this court announced the following rule of law that we find applicable in the within case:

"As a general rule, a verdict will not be set aside for reasons that would be sufficient to disqualify a juror on a challenge for cause, which existed before the juror was sworn, but which was unknown to the accused until after the verdict, unless it appears from the whole case that the accused suffered injustice from the fact that the juror served in the case."

For the reasons stated, the judgment of the district court of Muskogee county is affirmed.

BRETT, P. J., and JONES, J., concur.