Elmer Dean **FIELDS**, Plaintiff In Error,

v.

The **STATE** of Oklahoma, Defendant In Error.

No. A–12548.

Criminal Court of Appeals of Oklahoma.

Feb. 26, 1958.

John W. Tillman, Fred A. Tillman, Pawhuska, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Elmer Dean Fields, plaintiff in error, hereinafter referred to as defendant, was charged by information in the district court of Washington County with the crime of murder (21 O.S.1951 § 701). He was tried before a jury that the county attorney did not qualify to assess the extreme penalty. The jury found defendant guilty of the included offense of manslaughter in the first degree (21 O.S.1951 § 711) but being unable to agree upon the penalty left that to the

court, who assessed punishment at life imprisonment in the State Penitentiary at McAlester. 21 O.S.1951 § 715.

A number of errors are alleged in petition in error and brief, and will be treated in the order presented, except as to the sufficiency of the evidence. We shall first consider the information, the pertinent part of which reads:

" * * * that Elmer Dean Fields did, in Washington County, and in the State of Oklahoma, on or about the 16th day of February in the year of our Lord, One Thousand Nine Hundred and Fifty-seven and anterior to the presentment hereof, commit the crime of Murder in the manner and form as follows:

"That the said Elmer Dean Fields, hereinafter referred to as Dean Fields, within the body of the county of Washington, State of Oklahoma, then and there being, did, then and there, knowingly wilfully, wrongfully, unlawfully, feloniously, without authority of law, and with the premeditated design to effect the death of one Elmer A. Fields, and prior to the filing hereof, make an assault and battery upon the said Elmer A. Fields, with a certain dangerous and deadly weapon used as a club, to-wit: a 16-gauge shotgun then and there had and held in the hands of the said Dean Fields, and did, then and there, with said weapon so had and held in his hands, unlawfully, wilfully, wrongfully, feloniously and without authority of law and with the premeditated design to effect the death of the said Elmer A. Fields, strike the said Elmer A. Fields, in and upon the head with said weapon, and did, then and there and thereby, inflict mortal wounds upon the said Elmer A. Fields, and thereafter the said Dean Fields did, then and there, knowingly, wilfully, wrongfully, unlawfully, feloniously and without authority of law and with the premeditated design to effect the death of the said Elmer A. Fields, maliciously set fire to and burn the said

Elmer A. Fields and the dwelling house in which he lay languishing, inflicting certain mortal burns in and upon the said Elmer A. Fields, of which said mortal burns or which said mortal wounds, or the combination thereof, the said Elmer A. Fields did, then and there, on the 16th day of February, 1957, die, as was intended by the said Dean Fields he should do, with the unlawful, wrongful and felonious intent then and there on the part of him, the said Dean Fields, to kill the said Elmer A. Fields, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State."

Counsel say that the information is defective in two respects: The first being that the information is duplicitous in that it charges more than one offense. On the other hand, the Attorney General urges that the information charges the single offense of murder.

 Of course, as urged by defendant, this court has held that an information must charge but one offense. Kimbrell v. State, 7 Okl.Cr. 354, 123 P. 1027; Tucker v. State, 8 Okl.Cr. 428, 128 P. 313; Flood v. State, 23 Okl.Cr. 398, 215 P. 215. These cases were cited by the defendant and there is nothing wrong with the principle of law stated. But an examination of the cases discloses fact situations far different from the within case.

In Kimbrell, the information contained two counts. The first charged the accused with unlawfully selling one pint of whiskey to one George Dailey; the second count charged the accused with having in his possession whiskey with intent to barter, sell and give away the same. Thus two separate and distinct offenses were charged.

In the Tucker case, the information charged the accused with stealing five hogs from Walter Simpson, and also with stealing nine hogs from Lena Nelson, and it was held that the information was bad for duplicity in that it alleged two separate and distinct ownerships of property without

alleging that the property of the two owners was stolen at the same time, and by the same act or transaction.

In the Flood case the information contained two counts. The second count was held to charge two different offenses: assault with intent to rob, followed by repugnant allegations, and a charge of assault with intent to steal, two separate and distinct offenses.

The statute (22 O.S.1951 § 404) states that the indictment or information must charge but one offense, but goes on to provide: "And where the offense may be committed by the use of different means, the means may be alleged in the alternative in the same count."

This clause or provision of the statute has been construed in a number of cases.

In Elliott v. State, 4 Okl.Cr. 224, 111 P. 820, 140 Am.St.Rep. 683, the accused was charged by information with manslaughter in the first degree. Accused was alleged to have struck the deceased upon the head, breast and left side with his fist, and with his feet "stomped and crushed" Isaac Carlico, and by said stamping, etc., he died. The proof on the other hand showed that deceased was holding a horse with one arm through the reins as he engaged in a fist fight with the accused; that the horse reared and that the deceased fell and that his head was crushed by the feet of the horse. The case was reversed for new trial. The court said:

"Whenever there is doubt or uncertainty as to the means by which death was effected, all the different probable means should be alleged, either in separate counts in the indictment or information, or in the alternative in the same count, so as to provide against contingencies in the proof and prevent a variance."

In Bruster v. State, 40 Okl.Cr. 25, 266 P. 486, the court held, paragraph two of the syllabus:

"Where an offense may be committed by the use of different means, the means may be charged in the alternative in the same count. Where an

information charging murder alleges that the homicide was committed by shooting with a pistol and by striking with an ax, the information is not duplicitous, and the state is not required to elect upon which of the means charged it will rely, and proof of either or both will sustain the allegation as to the means used."

See Bowman v. State, 82 Okl.Cr. 199, 167 P.2d 663, in which the information alleged in a single count two or more different means or acts constituting the offense charged, growing out of the operation of an automobile.

See Pruitt v. State, Okl.Cr., 290 P.2d 424, where the information charging murder alleged the homicide was committed by gunshot, and by striking with a blunt instrument and where it was held that the State was not required to elect upon which of the means charged it would rely, and that proof of either or both would sustain the allegation as to the means used.

See also in this connection: State v. Rizor, 353 Mo. 368, 182 S.W.2d 525; 40 C.J.S. Homicide § 150, pp. 1041, 1042; 26 Am.Jur. § 266, p. 339; 27 Am.Jur. § 66, p. 629.

The second contention is that the information is so indefinite in its terms that it is impossible for the defendant to know the offense with which he is charged. There is a rule for testing the sufficiency of an information, which is stated in Argo v. State, 88 Okl.Cr. 107, 200 P.2d 449, 450, as follows:

"An information that informs an accused of the offense with which he is charged with such particularity as to enable him to prepare for his trial, and so defines and identifies the offense that, if convicted or acquitted, he will be able to defend himself against any subsequent prosecution for the same offense, is sufficient."

We conclude that but a single offense was charged in the information in this case: Murder, and that it was not improper to set out all the different probable means by which death was effected.

■ At this point we shall consider the sufficiency of the evidence, it being contended that there was a total insufficiency of the evidence to support the conviction and that the demurrer to the evidence should have been sustained.

The record contains over five hundred pages, the evidence was wholly circumstantial except certain statements written out by the defendant following the taking of a lie detector test and other admissions, which defendant sought to repudiate. Our task will be to consider sufficient of the evidence to determine whether or not the court erred in overruling the demurrer.

Generally we may say the undisputed evidence developed that Elmer Fields' home was discovered with fire leaping out of a closed door and window about 3:30 a. m. February 16, 1957; later the body of Elmer A. Fields was discovered in the bedroom of the two-room cement building. It was later discovered that his skull was crushed on one side; there was a 16-gauge shotgun near that had the stock broken off but lying near; there was evidence of a gasolene fire under the bed of Elmer Fields. A gallon gasolene bottle was at one end of the bed with cap removed from the neck, the neck near, the bottom flat on the floor. Out of the evidence developed the 22 year old son who had been living with his father was charged with murder. The mother and wife had died a few years before, and a daughter was married.

The State to make out its case called Hazel Alexander, who testified that she lived next door to Elmer A. Fields in Dewey; that the defendant Dean Fields lived with his father; that her family consisted of herself, her 14 year old daughter, May Jane, and her husband, Orace; that her husband was employed by the Dewey Portland Cement Company; that they had a water well in the rear of the house on the property line and that the Fields used that well also; that she saw Mr. Fields at the water well on Friday, February 15, 1957, between 5:30 and 6:00 p. m., that he was wearing a plaid shirt and blue bib overalls; that she talked briefly with him; that she saw Dean Bales, an insurance man, visit Fields about 6:00 p. m., and later saw a man whom she thought was a Mr. Shephard. She said that her family went to bed about 11:00 p. m., but during the night they were awakened by a dog barking, and she seemed to hear someone moaning outside her home. She heard someone outside calling her husband, and she awakened him. She recognized the voice of Dean Fields; she discovered the Fields house was on fire and tried to call the fire department but the 'phone was dead. She let Dean Fields come in her home and asked him what was wrong, but he would not tell her, so she went up the block to a neighbor and 'phoned the sheriff and also the fire department. Witness identified State's exhibit No. 11 as the clothes Dean Fields was wearing the night he came to her home. One sleeve of his shirt was torn, and he had on field boots. She kept asking him what had happened, and he kept replying that he did not know. She said that at one time he got on his knees and said, "Oh, don't do that. I'll be good." Witness said it was around 3:30 in the morning when they were awakened.

On cross-examination witness denied that defendant went out to the well to draw water to put out the fire, but said that her husband went. She said that when they opened the back door after they were awakened the defendant was lying down; that he could not have tripped on the well curbing because there was a fence entirely around it. Witness denied that defendant ever asked her husband to save his father, but asked him to "get up and help him." She said defendant shed no tears but was just "hollering". She said defendant, after entering her home, was first in her kitchen on the floor and next in her living room sitting on the divan. He left her home with his half-brother between 5:00 and 6:00 a. m.

Orace Alexander testified that he had known Elmer A. Fields about ten years; that they lived next door to each other in Dewey; that on Friday night, February

15, 1957, at 3:30 in the morning, which would be the 16th, he was awakened by his wife; that he looked out the front door and discovered the Fields house was on fire; that he rushed through his kitchen and got the water buckets and went out the back door and ran over Dean Fields at the back door. He said that defendant was lying down flat on his face; that he asked him where his father was and he said that he did not know. Witness said he saw the boy was not hurt and he then rushed to the Fields house to try to fight the fire until the fire department arrived. He used two buckets of water at the front door of the Fields house, where the main fire was. That after the fire department got there in about twenty minutes and after they quenched the fire they discovered a body in the house. That a man he took to be Fields "was kneeling down on his right knee and with his right arm down, left arm against the bed, with his head laying in against the mattress, right side of his head." He said this was in the northeast corner of the room and that the fire was concentrated there. He said the body was rolled into a rubber sheet and taken out through the front window to the funeral home. He denied that the defendant ever helped or offered to help fight the fire. Witness said that he had been in the Fields home on Wednesday night and that Elmer Fields slept on a bed in the northeast corner of the room. The kitchen was shown to be to the west and Dean Fields slept on a bed to the northwest of his father.

Phil D. Leipold, fire chief, testified that on the morning of February 16, 1957 at 3:45 he answered a fire call and went to the Elmer Fields home in Cement Town, in Dewey. He said that the fire was coming out of the east window and front door; that there were two rooms, the east room being the bedroom and the west the kitchen. He said that he fought the fire with "fog", through the north window, and that "Elmer Fields' body was laying right here in this window and there was fire all around him". Witness further testified:

"Q. Did you say you had trouble putting the fire out? A. Yes, sir. The fire ignited back on me.

"Q. Why, if you know, did that occur? A. Well, sir, it seemed something else was burning beside just wood. It seemed the fire had been fueled some way.

"Q. What caused you to have that opinion? A. Well, the fire just ignited all over the room. Back where we had been and had it out. We were using the fog to put it out. That fog will knock a fire out mighty quick. That's when it went back.

"Q. Do you have any opinion why the fog didn't put the fire out? A. The fog did put the fire out, but the fire ignited back.

"Q. Can you tell the jury why, in your opinion? A. To me, it seemed like it had some kind of fuel on it that created a fire that burned. Gas or something."

On cross-examination witness reiterated that he determined that the fire was a gasolene fire. Said he:

"A. That is what I determined it was, a gasolene fire, yes sir.

"Q. Now, I want to ask you what you say you found with reference to a gasolene jug or some container there? A. There was a gallon glass jar or jug, just plain, clear glass, sitting, oh, just in from the door about from here to that table (indicating), and the neck was intact laying over to the side. And the bottom of the jar was setting on the floor and the sides setting down on it.

"Q. Where was the cap? In the fire? A. The cap? No, the cap was laying over there at the side."

He further said that the way it looked the fire originated under Elmer Fields' bed. He said the mop board and wall by the bed were badly burned while the re-

mainder of the house was not so badly burned. Pictures of the room were introduced showing the complete destruction of the mattress of the father's bed, while the son's bed was not destroyed. Both beds were of iron, both the head and foot being of about three or four inch rounded pipe.

Witness said that he did not use a solid stream of water on the fire, but "fog", a thin mist of water, and that he did not disturb anything in the house; that when he got to the fire Mr. Alexander, a neighbor of the Fields', was throwing buckets of water on the fire and that he never did see Dean Fields anywhere around.

E. McCombs, sheriff of Washington County, testified that he got to the Fields fire the morning of February 16, 1957 at about 4:30. Later he went back to the place to make a further investigation, which he described in detail, using a map of the remains of the building, the walls of which were of cement. He said that he found a shotgun in approximately the middle of the front room, the bedroom; that the gun was broken open at the breech and that the stock was off, and he found the stock of the gun two and a half feet in a northerly direction from where he found the barrel. He said that he brought the barrel and stock to the sheriff's office and later turned them over to Bill Bryant of the Oklahoma State Crime Bureau.

A. J. Cox, deputy sheriff, testified that at about 8:30 or 9:00 o'clock the morning of February 16, 1957 he went with sheriff McCombs and Bill Bryant of the Oklahoma Crime Bureau to investigate the Fields fire. He said that he found the bib of a pair of blue denim overalls, and in the pockets of the bib found a small pen knife, paper package of chewing tobacco partly used, part of a tin of smoking tobacco, but did not find a pocket book or bill fold. He said that on February 19th he made a screen with three-quarters inch chicken wire and screened the ashes of the debris looking for the bill fold, but did not find it. He found a bank book of a remote date. He found the bottom of a

gallon jug between the burned out bed and the east door, and the cap to a gallon jug. All articles were taken to the sheriff's office, and later turned over to Mr. Bryant. This witness also obtained from Dean Fields the shirt and levis he was wearing the night of the fire.

Dr. Alfred M. Shideler of Oklahoma City testified that he was at the University of Oklahoma Medical Center and had specialized in pathology. His qualifications were admitted by defense counsel. This witness said: "A pathologist is a doctor who is concerned primarily with what we think of as the laboratory aspects of medicine; the examination of tissues removed by surgery, and other laboratory examinations in the performance of an autopsy". He said that he had conducted approximately one thousand such examinations. He examined the body found in the Fields home at Dewey, identified as the body of Elmer A. Fields. He first saw the body in the morgue of the University Hospital, Oklahoma City, February 17, 1957 and performed an autopsy on it that day. Witness by reference to his notes detailed the teeth that were missing. He was asked if from the autopsy he was able to determine the cause of the death of the person, and answered in the affirmative. Said he:

"A. Death was due to his being in a fire.

"Q. How did you determine the cause of death? A. The air passages and lungs showed a considerable amount of carbon, soot-like material, on the surfaces extending clear down into the air passages within the lungs. So that this was evidence that he had inhaled a considerable amount of soot, smoky material. There was also a reaction of the lining of these air passages such as is seen in reaction to heat. A blood carbon monoxide level, which was reported to me, also confirmed that he was alive during the fire.

"Q. And what about whether or not the body was exposed to burning? A. Yes, the body was exposed to

burning. There was evidence of considerable burning on the outside of the body.

"Q. From that, did you determine the cause of death? A. Yes.

"Q. And what was the cause of death, Doctor? A. It was due to his being in a fire.

"Q. Did you find any evidence in that person of a heart attack? A. Yes.

"Q. Did you make any determination as to whether that heart attack caused his death? A. Yes.

"Q. Did that heart attack, in fact, cause death? A. No.

"Q. Could you tell how recent that heart attack occurred prior to the time of death? A. Yes.

"Q. Could you tell us the approximate maximum length of time it could have occurred, if you know, prior to death? A. Approximately twelve hours.

"Q. Could you tell us now the approximate minimum time that it might have occurred prior to death? A. It could have been as short a time as a few minutes.

\* \* \* \* \* .\*

"Q. Doctor, you know the reactions, internal reactions, of the body to physical combat, something that transpires inside the human body? A. Yes.

"Q. Do you know what relation physical exertion would have to the heart? A. Yes.

"Q. If a person were susceptible or were exposed to physical combat, who had other characteristics which might—let me rephrase that: Having testified that a person having physical exercise would have a body reaction, would that body reaction, coupled with any other factor or standing alone, cause what we call a heart attack? A. It might.

\* \* \* \* \* \*

"Q. What did you find, Doctor, in your autopsy? A. I found the evidence of burning, which has already been described; and I found the evidence of the heart attack, which has already been described; *I also, found evidence of injury to the head, including fractures of the skull. There were fractures in three areas of the skull.* One over the top part of the head in which the fragments of that fracture were extended outward from the rest of the skull. I found a fracture in the region of the left temple, in which the fragments of the skull protruded inward toward the skull cavity. And an area of fracture behind the right ear, in which the fragments of the skull extended inward into the skull. I also found evidence of hardening of the arteries, arteriosclerosis as it is known medically, involving the arteries of the heart and of the aorta. There was a fatty change in the liver; there was an increase in the size of his prostrate gland; there was a small nodule in one kidney, which is known medically as an adenomal, a deposit, small amount of calcium deposit, within his kidneys. There was within the lungs evidence of his having inhaled some material beyond carbonaceous material, that is, carbon dust and rock dust, which had caused a reaction in his lungs. And also the evidence of the previous operations, which have been described.

"Q. Now, these fractures you have mentioned, Doctor, directing your attention to the one on the top of the head that you mentioned first: Could you tell, from your examination, whether that was caused by internal or external force? A. Yes.

"Q. And which was it? A. It was caused by internal force.

"Q. And did you determine what would have produced that internal force? A. This is the sort of a fracture which is commonly seen in a body

that has been burned with the heat causing an increase of pressure inside the skull with an actually blowing out of the fragments of the skull.

"Q. Now, you have testified as to two other fractures. Where were they located? A. One was in the region of the left temple, and the other was in the region behind the right ear.

"Q. Did you determine whether or not the fracture in the left temple region was caused by internal or external force? A. Yes.

"Q. Well, which was it caused by? A. It was caused by external force.

"Q. How could you tell that it was caused by external force? A. The fragments of the skull were depressed inward in toward the central portion of the skull and the lines of fracture, the angle between the two fragments diverged toward the inner portion of the skull.

"Q. Could you determine from your examination and autopsy whether the fracture you describe as to the left temple region was caused by a blunt or sharp object? A. Yes.

"Q. And which was it caused by, if you know? A. It was caused by a blunt instrument.

"Q. Now, as to that fracture to the right side of the head that you have testified to, was it caused by internal or external force? A. It was caused by external force.

"Q. And how did you determine that it was caused by external force? A. The fragments of the bone were depressed inward toward the central portion of the skull and the angle between the fragments of the fracture diverged toward the inner portion of the skull..

"Q. Can you tell us whether those fractures which were caused by exterior force to the skull on the left and right side of the head occurred before or after death? A. Yes. ..

"Q. Well, did they occur before or after—which did they occur, before or after? A. Before death.

"Q. How do you determine that the external fractures to the left and right side of the head occurred prior to death? A. There was evidence of violent reaction on the muscles underlying the region on the left side of the head. There was hemorrhage evident within the fragments of bone on the right side of the head and, also, hemorrhage evident on the surface of the brain. .

"Q. Can you say whether or not those fractures to the left and right side of the head occurred by reason of the fire? Were they caused by the fire? A. No.

"Q. Let me ask this: Were they caused as a result of the fire? A. I am not quite sure.

* * * * * *

"Q. Doctor, I show you what is marked as State's exhibit number 2 and ask you what that is, please sir? A. It's a gun.

"Q. And have you ever seen that gun before? A. Yes.

"Q. And where did you first see it? A. Saw it in the State Health Department office in Oklahoma City.

"Q. And in whose custody, if you know, was that gun? A. The custody of Mr. Taylor Rogers.

"Q. About when, if you recall, did you see that gun? A. I saw it on two different occasions. Once I believe it was about March the 2nd, and the second time last Saturday, that is, June the 22nd.

"Q. Can you tell us whether or not that gun is in the same condition now as when you examined it in the laboratory? A. It looks the same to me.

"Q. At the time that you examined that gun, did you examine it in relation to anything else? A. Yes.

"Q. And what was that? A. Fragments, portions of the skull, which were removed from the body of Mr. Fields at the time of the autopsy.

"Q. Is that the same body we have been referring to in this examination? A. Yes.

"Q. I show you, Doctor, what is marked as State's exhibit number 12, and ask you what that is? A. That is a jar containing portions of the bone, to which I have just testified about.

"Q. Was that obtained during your autopsy? A. Yes.

"Q. In whose custody has that exhibit been since the autopsy? A. In mine.

"Q. Is it in the same condition when you examined it now as it was at the time you obtained it? A. Almost the same.

"Q. What changes, if any, have been made? A. Some of the soft tissue was removed. It was placed in a fixative and subsequently dried out.

"Q. Did you examine that section of the skull in relation to any other object? A. Yes.

"Q. What was that object? A. To the gun which I have just examined here.

"Q. Where was that examination made? A. In the office of Mr. Taylor Rogers, State Health Department, in Oklahoma City.

"Q. Doctor, did you determine whether there was any relationship between that section of the skull and that gun? A. Yes.

"Q. Will you please demonstrate to the jury what relationship you found between the skull and the gun and how you determined that relationship? If you will, come down here, please.

"(Witness leaves witness stand and stands in front of the jury.)

"Mr. Tillman: That is objected to, if your Honor please. It is incompetent, irrelevant and immaterial.

"The Court: Overruled.

"Mr. Tillman: Exception.

"The Witness: (demonstrating to jury) These fragments of bone were those removed from the region behind the left ear and fit together in approximately this way. Knowing the size of these defects, particularly this one back here which has a fairly definite outline and is 0.6 x 0.8 centimeters in dimension, I examined the gun to see if there was any portion of it which was approximately that same size. The hammer of the gun is 0.8 centimeters wide. Then by taking these fragments and holding them up here, one at a time and together it can be seen that this defect

"Mr. Tillman: We object, if your Honor please, to this manner of testifying.

"The Court: Let him make his demonstration without oral comment.

\* \* \* \* \* \*

"The Witness: This small fragment was also compared in relation to this portion of the gun. And this—

"The Court: Can the jury see all right? (No response.)

"The Witness: And this compared here with this portion of the hammer. Furthermore, the portion of the fracture away from this hole was compared to see how it fit with other parts of the gun, in a manner like this (indicating).

"Q. Did you draw any conclusions from your examination, Doctor, of that gun and that skull? A. Yes.

"(Witness returns to witness stand.)

"Q. And what was that, if you please?

"Mr. Tillman: We want to make an objection, if your Honor please. We move to strike all the testimony for the reason and on the ground this skull has not been introduced in evidence yet. It has been permitted to be exhibited to this jury.

"The Court: Overruled at this time. You may answer.

"Mr. Tillman: Exception.

"Q. What relationship, if any, did you determine, Doctor, by virtue of this examination as you have demonstrated? A. That the size of the defect in the skull, of one defect particularly, corresponded quite closely to the outlines of the hammer of this gun, and the fracture that is adjacent to this corresponded in general outline to the areas of the gun.

"Q. Could the fracture which you have demonstrated to the jury as occurring to the right side of the head have produced death if there had been no fire?

"Mr. Tillman: We want to make an objection to that. The witness has heretofore testified the cause of death was a conflagration, or fire.

"The Court: He can give his opinion.

"Mr. Tillman: Exception.

"The Witness: Answer that? Mr. Laughlin: Yes.

"The Court: It is overruled.

"The Witness: Yes.

"Q. And what would have been the effect, if you know, on a person receiving such a fracture? A. It is quite probable that he would have become unconscious very rapidly.

\* \* \* \* \* \*

"Q. The question is, do you have an opinion as to whether a person would or would not have been aware of a fire after he had sustained such a fracture? A. I do have an opinion.

"Q. What is your opinion?

"Mr. Tillman: That is objected to as incompetent, irrelevant and immaterial.

"The Court: Overruled.

"Mr. Tillman: Not based on a statement of fact within his knowledge.

"The Court: Overruled.

"Mr. Tillman: Exception.

"The Witness: It is my opinion that a person probably would not be aware of a fire around him.

"Q. Do you have any opinion as to whether a person would or would not have been able to escape a fire after he had received a fracture such as you have demonstrated?

"Mr. Tillman: That is objected to as incompetent, irrelevant and immaterial. It is in opposition to the allegation of his information.

"The Court: Overruled.

"Mr. Tillman: Exception.

"A. I do have an opinion.

"Q. What is your opinion?

"Mr. Tillman: That is objected to as incompetent, irrelevant and immaterial. Improper.

"The Court: Overruled.

"Mr. Tillman: Exception.

"A. I have an opinon that a person who has sustained a blow such as this would not be able to get out of a fire.

\* \* \* \* \* \*

"Q. Doctor Shideler, what relationship, if any, exists between the lever of that gun and the skull fracture you have testified to?

"Mr. Tillman: Object to that as incompetent, irrelevant and immaterial.

"The Court: Overruled.

"Mr. Tillman: Exception.

"A. The lever of this gun corresponds very closely to an area of fracture on the skull.

"Mr. Laughlin: I would like to offer State's Exhibit Number 12 into evidence at this time.

"Mr. Tillman: To which we object. It has already been testified about and exhibited to the jury without having it offered and it is incompetent, irrelevant and immaterial and there has been no proper identification of it, and not the time to offer it.

"The Court: Overruled. Admitted.

"Mr. Tillman: Exception.

"(State's exhibit No. 12, same being container containing portions of skull, is offered and received in evidence.)"

Witness, after rigid and prolonged cross-examination did not deviate from the testimony given on direct examination.

Taylor Rogers, chief chemist for the Department of Public Safety and the State Crime Bureau, testified concerning a number of items shown to have been taken from the Fields house after the fire. He also testified concerning the plaid shirt shown to have been worn by the defendant the night of the fire, and given to the officers by defendant. The right sleeve was torn and buttons missing, and witness had taken a plug of cloth out of the sleeve near the cuff where there was a brown colored stain present. By chemical analysis witness determined that the stain was human blood, blood group A. The shirt was not singed or scorched. Witness was also shown State's Exhibits 2 and 3, the gun barrel and stock. Said witness:

"A. Well, I examined the parts of the gun to see if they would fit together. So much of the stock was missing until there was nothing to compare with. But the bolt that holds the stock in place was removed, and under the microscope, placed in proximity with the broken part of the metal bolt in the gun frame. And I found that they fitted together under magnification of some ten to twenty diameters. They fit together in such a way that I could draw an opinion as to how the bolt was broken."

The conclusion of the witness was that the fracture of the metal bolt was caused by the gun having struck an object.

Witness had examined a blood sample taken by Dr. Shideler from the body of Elmer A. Fields and he found it to contain .12 per cent by weight of alcohol.

Bill Bryant, agent for the Oklahoma Bureau of Investigation, testified that on February 18, 1957 he was in Washington County investigating the fire and death of Elmer A. Fields in Dewey, and that he had a conversation with the defendant concerning the fire; that defendant was not under arrest and that the statements were voluntary. He stated that Sheriff McCombs, Deputy Cox and the county attorney were present when he talked with Elmer Dean Fields. The jury was excused and the court heard evidence to determine as a matter of fact if the statements were actually voluntary. The hearing was quite lengthy. Witnesses for both the State and defendant testified. There were three statements involved. The court ruled that a statement made on February 18, 1957 in the room adjoining the court room was inadmissible, not on the ground of voluntariness or involuntariness, but that it was incompetent, irrelevant and immaterial. It is our opinion that the statement was not irrelevant, but the error favored defendant. The court ruled that a written statement made in Oklahoma City following the lie detector test would be admitted. The court ruled out a statement made by the defendant to Bill Bryant some time after midnight on March 8, 1957 as not voluntary.

The jury was recalled and witness Bryant testified that defendant, after being advised of his constitutional rights, made a verbal statement to him in the room adjoining the court room of Washington County on February 18, 1957 and that later in Oklahoma City where he had voluntarily gone to undergo a lie detector test, defendant made a statement in his own handwriting. The circumstances surrounding the making of the written statement were shown, and this statement was admitted in evidence:

"I, Elmer Dean Fields in the presence of my sister Loretta Fields and in the presence of jim laughlin do hereby swear and make the following free and voluntary statement in my own handwriting this seventh day of March nineteen and fifty seven, concerning the events on the night my father died. I got home at about 12 p. m. midnight feb. 13 *niteen* fifty seven. I entered

the front door and daddy was in the kitchen. I went on into the kitchen and started getting me some supper, daddy was mad about something shep had said about joanne. He argued with me about getting a job and I told him I was going to leave the next day to go to illinois to try to get a job and he said something about what was I going to do about joanne running arround on me while I was away and I told him to shut up and mind his own bussiness and he got mad all over again. I took mother's picture off the dresser and started to put it in my suit case and he told me put it back, I told him to go to hell and he grabed at the picture. I pushed him into the brown chair by the door and he fell on the floor beside it, I went back to the dresser to get some more pictures of joanne and daddy got up and went into the kitchen, he came back with my shot gun and told me I wasn't leaving the house with mothers picture and I said I was, he told me if I tried to he would shoot me but I didn't believe him and laughed at him, that made him madder than ever. he opened the dresser drawer and got a shell which he put into the shot gun, he said he was tired of the way I had been acting like a king and not working or helping with the bills. I told him to put up the shot gun or I would take it away from him. He pointed it at me and I grabed at it and missed he triped over the foot stool and fell into the little table at the end of his bed. I grabed the end of the shot gun and tried to pull it away from him but he hung on and tried to get it loose from me, we rassled for a moment and then he hit me with the gun and I guess I lost my head then, I remember grabbing the gun and yanking but couldn't get it loose from him. I trid to hit him with it but he hung on, then he let go as I jerked on it again and he fell to the floor. I couldn't see anything because it was dark, I started toward the kitchen, as I went

through the kitchen door I lit a match to see where I was going the next thing I knew there was a large flash and fire all over the place. I got scared then and ran out the back door and I guess I shut it behind me I started to run and fell as I crossed the well curb. I crawled the rest of the way to alexanders back door. I was scared that someone would ask me what had happened but no one did so I let them believe it was an accident. I am really sorry about the way it turned out but I can't do anything about it because daddy is gone and I didn't want to tell people, how he had threatened to shoot me and that I didn't have the guts to go back in after him when I found out what had happened when I lit the match. I recall only little of what happened after that, I remember going to the well but I didn't have the strength to draw water then I fell down after that I remember only that joanne was there and getting over to lewises and that I had a terrable headache.

"(Signed Elmer Dean Fields.
"Witnesses: Delores Loretta Brewer.
"James H. Laughlin."

After returning to the sheriff's office following the making of the written statement, the defendant made a further wire recording statement giving more details of his fight with his father, and the fire, but the court would not admit this statement on the ground that the authorities had not re-advised defendant of his constitutional rights.

There was much other evidence by the State by way of identifying pictures of the home following the fire, the body of the victim at the undertakers, which was not recognizable but there was a kidney operation scar and missing teeth testified to by a family doctor and dentist that fit in with the body discovered in the building.

We think from the above that there was sufficient evidence for the court to submit to the jury the question of defendant's guilt of the crime charged, and that the

court did not err in overruling defendant's demurrer to the evidence.

Defendant testified, said that he had lived in Dewey all his life; that he was 22 years of age; that his mother had died a few years before and his sister had married just prior to his father's death; that his father had been employed by the Dewey Portland Cement Company; was a man of 5' 2" tall and weighed 150 to 160 pounds. He said that both his father and mother drank to excess, and that he and his sister in their childhood had to more or less look out for themselves. He admitted that his father had supported him and had even kept up payments on two second hand cars. In 1955 he and his father moved into the two-room company house in cement town, Dewey, and had batched. He said that he was unemployed but was engaged to Joanne Amos and had planned to go to Illinois to hunt for work. On the night of February 15, 1957, he got home about midnight, after visiting his girl friend. He found his father in the kitchen washing dishes. Defendant prepared something to eat while his father finished the dishes, and he and his father talked about defendant's planned trip to Illinois, his father in his youth having lived in Illinois and been a farm laborer. He denied that any ill feelings arose between him and his father. He said after the talk his father went in the bedroom and sat in his easy chair and smoked, and that he went in that room and got a mystery book and retired to the kitchen and read his book. He said that earlier in the day he had stripped a lawn mower and washed the parts in gasolene and put it back together. He said that he kept the gasolene in a clear one-gallon jug; that he had kept the gasolene in the house for about a month and his father knew about this. He said the bottle was in the east portion of the bedroom. He said like he told the county attorney that he did not remember whether he screwed the cap on the bottle or not. He said the gasolene bottle was about four feet from his father's chair; that he continued to read his mystery book in the kitchen, and his

father to smoke his pipe in the bedroom. Said he:

"And I guess I went to sleep. I do that sometimes. I think I fell out of the chair. I wouldn't swear to it either way. Wouldn't say I did. Wouldn't say I didn't. Anyway, when I woke up smoke and fire was coming from the front room. I ran out the back door. Went to the neighbor's house and awakened them. Gave the alarm.

"Q. All right. You say you fell out of the chair, you think? A. Well, sir, that's all I could figure out that could have happened to me, I believe."

Defendant further stated that he did not know for sure whether his father was in the front room or not. He said his father had been drinking. He said he went thirty or forty feet to the Alexander house next door and awakened the family. He said on the way he fell down and bumped his head and tore his sleeve on the well curb. He said he believed that he asked the Alexanders to call the fire department. He said he believed that he asked them to help get his father out of the fire. He said he remembered getting in the Alexander house and Mr. Alexander going out the back door but did not remember anything more only a Mr. Roop shaking him by the shoulder and him saying to Mr. Roop: "I don't know." He said that he did not even know what Mr. Roop had asked him. He said that he was dizzy and scared. Witness then said that he remembered Mr. Alexander getting buckets and going to the water well in the back yard and he said that he also went to the well. He did not remember the fire department, but did remember going in the front room and sitting on the divan until a half brother came and got him.

Defendant told about taking the lie detector test in Oklahoma City, and about writing out a statement thereafter, but claimed that although Bill Bryant, of the Oklahoma Crime Bureau, was not in the room at the time, that he had told defendant that they had already figured out what

happened and that he should just write it out that way, and if he did not make a statement he would have his girl friend, Joanne, arrested as an accomplice. He said that only his sister and the county attorney were present when he wrote out the statement and that he gave the statement to the county attorney when he would finish a page and that the county attorney and his sister acted as witnesses.

Witness said that his father had been operated on for gall bladder trouble in 1954 and had complained of pain in his chest around his heart within six months prior to his death. He denied striking his father over the head with a shot gun, or setting the fire, and claimed that he and his father got along well.

On cross-examination defendant admitted that he had been convicted of felonies on two occasions prior to the within charge.

Other witnesses testified to the fact that the deceased supported the defendant; that the deceased was addicted to drink; his grocer testified to the deceased having cashed his check at his store the evening prior to his death, and that he paid a back bill, but witness thought deceased was sober at that time.

Harold Meade said that he sold Dean Fields an old automobile and that his father paid the bills.

After defendant rested his case, Orace Alexander testified on rebuttal and denied that defendant even asked him to call the fire department the morning of the fire, or advised him that defendant's father was in the building, and denied that defendant in any way helped fight the fire by drawing water or otherwise.

James H. Laughlin, county attorney, testified and denied that he, Bill Bryant or anyone to his knowledge outlined to defendant what to put in the statement defendant wrote out as to the purported facts of the death of Elmer A. Fields.

Bill Bryant denied that he outlined to the defendant a statement, or the substance of a statement or promised him anything

for making such statement, or threatened him if he did not.

 As we have often said, one may be convicted upon direct or circumstantial evidence, or both. Taylor v. State, 82 Okl.Cr. 49, 166 P.2d 108; Hood v. State, 80 Okl.Cr. 175, 157 P.2d 918. Here most of the evidence was circumstantial, but the written statement by defendant wherein he admitted a fight with his father and that he struck a match and immediately thereafter a fire started, was direct evidence. Such admission in connection with the circumstantial evidence was sufficient to support the verdict of the jury. As was said in paragraphs 8 and 9 of the syllabus by the court in Henderson v. State, 95 Okl.Cr. 342, 246 P.2d 393, 395:

"Where the evidence is conflicting and different inferences may be drawn therefrom, it is the province of the jury to weigh the evidence and determine the facts.

"The function of the Criminal Court of Appeals is limited to ascertaining whether there is a basis, in evidence, on which the jury can reasonably conclude that accused is guilty as charged."

 There is some complaint as to the court admitting evidence of the deceased's dentist as to particular teeth missing, and his family doctor as to the gall bladder surgery. The body was burned beyond recognition, but it was shown that the dental history of Elmer A. Fields matched that of the body and that the scars from a gall bladder operation were present. The admission of evidence that deceased cashed his pay check and paid his grocer the afternoon of February 14, and had $75 left was properly admitted because no bill fold or money was found in the overalls bib and such fact might be considered as bearing on the motive for the murder, or for the fire, if other evidence indicated foul play. Other complaints are made to rulings of the court, but from a reading of the entire evidence it is apparent that the court was very careful in making his

rulings as to the admission or rejection of evidence, and we discover no reversible error in this respect.

■ We note that the defendant offered two instructions which the court refused to give, but no exceptions are noted. We have carefully read the instructions given, and do not find a record of any objections on behalf of the defendant. The instructions given covered every phase of the case justified by the evidence and record. Instructions were given covering the included offense of manslaughter in the first degree and manslaughter in the second degree. The evidence did not justify the giving of an instruction on assault and battery as contended by defendant. The instructions were fair and impartial. Particularly we note that the question of whether the written confession or statement made by the defendant in his own handwriting was voluntary was submitted to the jury. The jury was also properly instructed as to evidence of admissions by the defendant received for impeachment purposes.

The court instructed the jury that it could not consider evidence pertaining to the bill fold and money belonging to deceased, and photographs of the body of the deceased. This ruling is debatable, but was in favor of the defendant.

It is next asserted that the trial court committed error in permitting the jury to separate without permission of the defendant.

■ The record shows that trial commenced on the morning of June 24, 1957, and that the jury returned its verdict at 11:20 p.m. on June 26. During the progress of the trial, and before the case was finally submitted, the jury was permitted to separate several different times. The record shows the following:

June 24, 11:30 a.m.—Jury was permitted to separate during lunch hour to be back at 1:30. No objection noted by defense counsel.

June 25, 12 o'clock noon.—Jury was permitted to separate during lunch

hour to be back at 1:30. Defendant objected, which was overruled with no exception noted.

June 25, 3:45 p.m.—"The Court: Counsel for State and defendant have both informed me they have no objection to you separating and going about your ways tonight. You will come back tomorrow at 9:00 o'clock."

June 26, 9:55 a.m.—Jury was permitted to separate while counsel were arguing defendant's demurrer to the evidence. It was agreed by the State and defendant to waive the presence of the jury during the presentation of the demurrer.

June 26, 10:27 a.m.—Jury was permitted to separate while court was preparing instructions. No objections noted.

The record fails to disclose that the jury was allowed to separate after the case was finally submitted. We further note that there was no assignment of error either in the motion for new trial, or in the petition in error, relative to the separation of the jury without permission of the defendant.

22 O.S.A. § 853, in part provides:

"The jurors sworn to try an indictment or information, may, at any time before the submission of the cause to the jury, in the discretion of the court, be permitted to separate, or to be kept in charge of proper officers." (as amended Laws 1945, p. 97, § 1.)

See the following case, and cases cited therein, covering the point at issue, and adversely to the defendant: Cox v. State, Okl.Cr., 283 P.2d 545.

■ It is finally contended that the trial court committed error in refusing to require the jury to assess the punishment.

We find from the record that the jury returned into court a verdict finding the defendant guilty of manslaughter in the first degree, and stated in the verdict that they were unable to agree upon the pun-

ishment, and left the same to be assessed by the court.

When the verdict was returned into court, and had been read by the clerk, counsel for defendant objected to the form of the verdict, and asked the court to require the jury to fix the punishment. The objection was overruled, and defendant was allowed an exception. Then at the request of defendant's counsel, the jury was polled and each member of the jury, when asked if that was his verdict, answered in the affirmative.

From a careful examination of the record, we do not find where counsel for the defendant at any time before the jury retired for deliberation requested the court to instruct them to assess the punishment in the event they found the defendant guilty. See Ex parte Monroe, 89 Okl. Cr. 358, 207 P.2d 944, where we said:

"Where the jury has returned its verdict of guilty into court, including in said verdict the statement that the punishment cannot be agreed upon, and such verdict is announced in open court, it is then too late for the defendant to request that the jury assess the punishment."

By reason of the foregoing, the verdict of the jury as to guilt must be affirmed.

But we have spent some time considering the punishment assessed by the court—life imprisonment. We are convinced from a study of the entire record that Elmer A. Fields came to his death by violence. There were the skull fractures penetrating inward, said by the medical expert to have been sufficient to have caused the death of defendant; and which eventually would have, but did not because prior to such happening from such wound, the defendant died from inhaling the gasolene fumes as shown by the lungs. There was evidence of a coronary thrombosis attack, but the evidence was that such in the opinion of the expert was brought on by the blow and the fire. It is true that the circumstantial evidence all points to defendant as having brought about his father's death, but the only direct evidence is the written confession introduced by the State, and in it defendant claimed that after he and his father had argued that his father went into the kitchen and got defendant's shot gun and threatened to shoot defendant, and defendant grabbed the shot gun, that his father hit him with it, and defendant lost his head and wrestled the gun away from the father and tried to hit him with the gun, but that it was dark; that defendant went through the kitchen door and lighted a match and there was a flash and fire. Such evidence shows the father to have been the aggressor to commence with, though it further shows that in a heat of passion the defendant brought about the death of his father. Still, considering the uncertainties, we think justice would best be served by reducing the penalty from life imprisonment to a term of forty years confinement in the State Penitentiary at McAlester.

The judgment as so modified is affirmed.

BRETT, P. J., and NIX, J., concur.