Michael Leroy GLOVER, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–278.

Court of Criminal Appeals of Oklahoma.

Nov. 30, 1976.

Rehearing Denied Dec. 28, 1976.

Curtis A. Parks, James A. Williamson, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellant, Michael Leroy Glover, hereinafter referred to as defendant, was charged in the District Court, Osage County, Case No. CRF–74–838, with the offense of Murder in the First Degree, in violation of 21 O.S.Supp.1973, § 701.1. He was tried by a jury and convicted of Manslaughter in the First Degree, with punishment being set at One Hundred One (101) years' imprisonment. From said judgment and sentence he has perfected his timely appeal to this Court.

The incidents out of which the charge arose took place in December, 1974. The defendant returned to Tulsa from a two-month business trip in Wisconsin on the 9th of December, 1974. On the 11th, he and Karen Sue Keene, with whom he was living, went out to do some Christmas shopping. They stopped at the home of Johnny and Ruby Glover, a brother and sister-in-law of the defendant, to visit for awhile and to leave their two children, Shawn Doyle Keene, 22 months old, and Michael Leroy Glover, Jr., three months old, to go shopping. By the time they had finished shopping, stopped at Johnny Glover's house for the children, and returned home it was dusk. The testimony as to what happened next is conflicting, but it is uncontradicted that at about 9:30 or 10:00 p.m. Karen Sue Keene called Johnny and Ruby and asked Ruby to come over, saying

that "something had happened to Shawn." Then the defendant got on the phone and told Johnny to come over. When Johnny and Ruby got to the defendant's house, Johnny went inside and found Shawn lying on a pallet in the middle of the living room floor with a bluish cast to his skin and lips. He told Karen and the defendant to take the baby to a hospital. Several of the personnel at the Oklahoma Osteopathic Hospital of Tulsa, including Dr. Stanley E. Grogg who was on call at the emergency room, testified that Karen Sue Keene brought the baby into the hospital in a battered condition with bruises on the face, legs and trunk, an almost healed burn on the left hand and second degree burns on the buttocks. The child died December 16, and Dr. Robert Fogel, a pathologist, testified that in addition to the external injuries there was hemorrhaging on the lungs, a laceration of the pancreas which had led to pancreatitis, a fractured skull and hemorrhaging within the tissue of the brain.

Without going into sordid detail, Karen Sue Keene testified that the defendant became upset with Shawn and began striking him; and that he went on to inflict numerous injuries on the baby until he realized that the child was unconscious. Ms. Keene testified that at this point the defendant became frightened and the two of them began attempting to revive the baby. She wanted to go for help, but the defendant refused until finally he told her to call his brother, Johnny.

The defendant's version of the episode was markedly different. He testified that when they returned home from shopping he made a sandwich and sat down to watch television, but that he was tired from the drive back from Wisconsin only two days before and fell asleep. He was awakened later by Karen Sue Keene running into the living room with the inert Shawn, crying that the baby had fallen into the bathtub. After futile efforts to revive the baby he told Karen to call his brother, Johnny Glover.) He admitted that Johnny and

Ruby Glover had to pass by the hospital on their way to his house, and when asked why he had not taken the baby to the hospital on his own initiative could only say that he was not thinking straight at the time. He also admitted that he did not go into the hospital with Karen Keene, but went to Johnny and Ruby's house instead and called the hospital from there. (He said that Karen told him not to go in, but Karen said he told her to go in by herself.) He also admitted that he did not call the hospital again, and that he left town and went to Joplin, Missouri, a few days later knowing that the baby was in critical condition.

Ms. Betty Johnson, a former acquaintance of the defendant and Karen Sue Keene when they had lived in Galena, Kansas, testified that she encountered the defendant on December 15, 1974, in Joplin, Missouri, and that he said at that time he had not seen Karen and Shawn in a long time and as far as he knew they were in California (from whence Ms. Keene had come). The Oklahoma officers who transported the defendant back to Oklahoma after his apprehension in Joplin, Missouri, Officer Bill Mitchell and Officer Larry Johnson, testified that the defendant at first denied knowing Karen and Shawn but that after a search of his car (to which he had consented in writing) had turned up receipts indicating that he and Ms. Keene lived at the same residence, he admitted that he knew her slightly—that he had mowed her lawn a couple of times. The officers admitted on cross-examination that while they had obtained signed consents for extradition and search of the car, they had not obtained a signed waiver of the Miranda rights. They testified that the defendant made the remarks voluntarily, but the defendant denied making any statements at all and claimed that he had repeatedly refused to say anything without his attorney present.

At first the defendant and Karen Sue Keene were both charged with the crime and while they were in jail she sent him a number of letters which tended to exculpate the defendant and inculpate Ms. Keene. The defendant gave these letters to his attorney, and they were not brought out at the trial of Ms. Keene, which came before that of the defendant.

■ The defendant's first assignment of error is that the prosecuting attorney was allowed to cross-examine the defendant as to his silence regarding these letters at the time of Karen Keene's trial. However, a reading of the full transcript shows that no reversible error was committed. The letters were first put in evidence by the prosecution while Ms. Keene was on the stand with the expressed consent of the defense. She read the letters into the record, and testified that they had not been brought out at her trial. Then, when the defendant began his case in chief, his attorney took the stand as the first witness and testified, among other things, that the defendant had given him the letters upon being released from jail, but that at the time he had been attorney for both the defendant and Ms. Keene, and he had deemed it necessary under attorney-client privilege to keep the letters and to not turn them over to the District Attorney when Ms. Keene was tried. Finally, when the defendant took the stand in his own behalf he made no mention of the letters whatsoever on direct testimony, but the District Attorney brought them up on cross-examination, and asked him why he had not given them to the District Attorney's Office before the trial of Ms. Keene. The defendant's answer was simply that he had turned them over to his attorney and that he did not know what the attorney had done with them; that he left all decisions concerning the case to his attorney. It is our opinion that it was not error to question the defendant as to the letters, since his attorney had as a witness raised the subject earlier in putting on the defendant's case in chief. However, even if it had been error it would not have been prejudicial to the defendant since he was able to give a ration-

al explanation for his failure to mention the subject to the District Attorney before Karen Keene's trial.

■ The defendant's second assignment of error is that he was denied his constitutional right to a speedy trial due to the procrastination of the District Attorney during the preliminary hearing. In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court set out a balancing test concerning the right to speedy trial, and suggested for consideration the length of the delay, the reasons for the delay, the defendant's assertion of his right to trial and the possibility of prejudice to the defendant caused by the delay. We have previously discussed *Barker v. Wingo,* supra, and the right to speedy trial generally in *Bauhaus v. State,* Okl.Cr., 532 P.2d 434 (1975), and in reviewing the record of the case at bar in the light of these cases we cannot say that the defendant's right was violated. A ten month delay in a capital case is not sufficiently long to raise by itself a presumption of undue delay; nor do any of the reasons for delay indicate error. The preliminary hearing was continued once due to illness of the prosecutor, once due to the unavailability of a court reporter, once due to the unavailability of a witness, and twice to allow appeals from rulings of the magistrate.[1]

■ Passing to the fourth consideration suggested by the Supreme Court, we find no indications of prejudice to the defendant in this case. The United States Supreme Court identified in *Barker v.*

*Wingo,* supra, three interests which the defendant has in a speedy trial: to prevent oppressive pretrial incarceration, to minimize anxiety and concern on the part of the accused, and to avoid the possibility that the accused's case could be impaired by the passage of time. In *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), the Court observed that even when not incarcerated an accused may, while awaiting trial, be subjected to public scorn and deprived of employment, as well as be forced to curtail his speech, association and participation in unpopular causes. But the defendant in the instant case asserts none of these. He contends that his case was prejudiced in that the prosecution was able to secure the attendance of additional witnesses and the results of scientific testing. In matters such as these, however, the question of whether or not a continuance is justified is a question for the discretion of the trial court, and we find nothing in the record to indicate that that discretion was abused in this case. And, since we find no error in the continuance it does not matter that the defendant objected to them. That one factor alone without the other three will not create a violation of the right to speedy trial.[2]

■ The defendant's third assignment of error is that the trial court erred in overruling the defendant's motion to suppress the testimony of Officers Mitchell and Johnson as to incriminating statements made by the defendant without the presence of counsel. The general rule is enunciated in the second paragraph of the Syl-

1. As to the second continuation to allow appeal, the defendant asserts that it was granted over his objection, but we note the record shows that counsel for the defendant announced at that time his intention to appeal three separate rulings of the magistrate.

2. The defendant complains only of the three and one half month period over which the

preliminary hearing was held, and says nothing of the five and one half month period between the preliminary hearing and the trial. We note that during this time the date of the arraignment was changed four times at the request of the defendant, necessitating resetting of the trial.

labus to *Lambert v. State,* Okl.Cr., 471 P. 2d 935 (1970), as follows:

"When evidence is taken outside the hearing of the jury on a Motion to Suppress incriminatory statements made by an accused while in custody and there is sufficient evidence to support the ruling of the trial court that the defendant had been thoroughly advised of his constitutional rights prior to making any statement and knowingly and intelligently waived such rights and made incriminatory statements, the court's ruling will not be disturbed on appeal."

In the instant case the testimony of the officers if believed would establish an intelligent and knowing waiver. We hold that the trial court properly overruled the motion to suppress and left the question of believability to the trier of fact.

The defendant's fourth assignment of error—that the verdict was not consistent with the weight of the evidence—is without merit. As we said in *Williams v. State,* Okl.Cr., 373 P.2d 91, 94 (1962):

"[W]here there is competent evidence in the record from which the jury could reasonably conclude the defendant was guilty as charged, this court will not interfere with the verdict, even though there is a sharp conflict in the evidence, and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts."

See also, *Sadler v. State,* 84 Okl.Cr. 97, 179 P.2d 479 (1947); *Henderson v. State,* 95 Okl.Cr. 342, 246 P.2d 393 (1952); and, *Fields v. State,* Okl.Cr., 322 P.2d 431 (1958).

■ In the defendant's supplemental brief he makes a fifth assignment of error: viz., that the statute under which he was prosecuted—21 O.S.Supp.1973, § 701.1—is unconstitutional. His first contention in that regard is that the statute violates the Oklahoma Constitution, Art. V, § 57, which provides that no statute shall amend or extend the provisions of another statute solely by reference to the title thereof, but that such amendment or extension must be published fully in the new law. The defendant argues that since 21 O.S.Supp. 1973, § 701.1, ¶ 9, refers to § 843 of Title 21 of the Oklahoma Statutes without setting out the provisions thereof, then ¶ 9 must be unconstitutional. This argument was considered at length and rejected in *Jones v. State,* Okl.Cr., 542 P.2d 1316 (1975), at pages 1328, et seq. Paragraph 9 is the type of legislation known as reference statutes, a recognized and valid mode of legislation without which our statutes would be lengthy indeed; and, in this particular instance the above mentioned constitutional provision has not been violated. In addition to *Jones v. State,* supra, see, *Hassett v. Welch,* 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858 (1937); *State v. Howard,* 67 Okl.Cr. 289, 171 P. 30 (1918); *Ex parte McMahan,* 94 Okl.Cr. 419, 237 P.2d 462 (1951); *State v. Sheldon,* 96 Okl.Cr. 38, 247 P.2d 975 (1952); and, IA Sutherland Statutory Construction, § 22.25 (4th ed. 1972).

■ The defendant also contends that the statute should be declared unconstitutional due to vagueness, in that it "purports to cover 'premeditated' homicide in the one instance and then goes on to cover one who 'causes or permits' a homicide by reference to Section 843 [i.e., 21 O.S.1971, § 843]." Defendant's supplemental brief, page 10. The meaning of the statute, however, is clear. When one inflicts injury upon a child under the age of seventeen (17), intending for that child to die, such a person is guilty of murder in the first degeree. There is no vagueness.

Thirdly, the defendant argues that the statute is unconstitutional because of its provisions with regard to the death penalty. However, in *Riggs v. Branch*, Okl.Cr., 554 P.2d 823 (1976), we held that due to the severability provision in the original act the unconstitutionality of § 701.3, providing for the death penalty, did not affect § 701.1, under which the defendant in the instant case was charged.

Having considered all assignments of error raised by the defendant and finding none which would merit reversal, it is accordingly the opinion of the Court that the judgment and sentence in this case should be and hereby is, AFFIRMED.

BRETT, P. J., concurs in results.

BUSSEY, J., concurs.